# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GLOBAL AEROSPACE, INC.,              )
                                     )
    Plaintiff,               )
                                     )
v.                                   )          Civil Action No. _____
                                     )
METROPOLITAN WASHINGTON              )
AIRPORTS AUTHORITY,                  )
                                     )
    Defendant.               )
_____)

## COMPLAINT

Plaintiff Global Aerospace, Inc. ("Global Aerospace"), by counsel, hereby files its Complaint against Defendant Metropolitan Washington Airports Authority ("MWAA"), and in support thereof states as follows:

## PARTIES, JURISDICTION AND VENUE

1.    Global Aerospace is the agent and manager for an unincorporated association of insurance companies that issue policies of aviation insurance. The policies are issued through Global Aerospace, and Global Aerospace is responsible for the management and adjudication of any claims arising thereunder. Global Aerospace is organized under the laws of the State of Delaware with its principal place of business located at 51 John F. Kennedy Parkway, Short Hills, New Jersey 07078.

2.    MWAA is an independent body created by the Commonwealth of Virginia and the District of Columbia, with its principle place of business at 1 Aviation Circle, Washington, DC 20001. MWAA claims to be an additional named insured under an aviation insurance policy that

Global Aerospace issued to American Airlines, Inc. ("American Airlines") for the policy period of December 1, 2000 to December 1, 2001.

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000 and the parties to this action are citizens of different states.

4.      Personal jurisdiction and venue are appropriate in this Court because the Policy dictates that any insured claiming coverage "consent[s] to the exclusive jurisdiction of the courts of Delaware" to resolve any and all disputes involving the scope of coverage available under the Policy. See Policy at p. 31, Sec. 14.

## GENERAL ALLEGATIONS

5.      Effective for the policy period of December 1, 2000 to December 1, 2001, Global Aerospace issued an insurance policy on behalf of various insurers to American Airlines. That policy provides coverage for bodily injury, property damage and personal injury caused by an occurrence arising out of American Airlines' business and operations (the "Policy"). A copy of the Policy is attached as **Exhibit 1**.

6.      Pursuant to the Policy, the insuring companies, through Global Aerospace as their designated agent and manager, have the right and duty to defend their insureds in any lawsuit alleging bodily injury, property damage or personal injury, even if the allegations in the lawsuit are groundless, false or fraudulent.

7.      On December 11, 2002, a group of individuals filed a lawsuit against American Airlines, MWAA and others in the United States District Court for the Southern District of New York alleging injuries arising out of the September 11, 2001 hijacking of American Airlines' Flight 77 and subsequent crash into the Pentagon. That lawsuit has since been amended three

times, the most recent amendment being filed on July 18, 2007. A copy of the Third Amended Complaint is attached as **Exhibit 2**.

8.     The Third Amended Complaint alleged, among other things, that American Airlines and MWAA were responsible for maintaining the airline and airport security system at Dulles International Airport, that American Airlines and MWAA failed to maintain the airline and the airport security system, and that such failures were a proximate cause of the hijacking and crash of Flight 77.

9.     On November 13, 2006, MWAA tendered its defense of the Third Amended Complaint to Global Aerospace, arguing that it was an additional insured under the Policy.

10.     The only applicable insuring agreement within the Policy that could potential provide coverage for MWAA's benefit is Insuring Agreement I. A – Bodily Injury & Property Damage Caused by Occurrence. That insuring agreement affords defense and/or indemnification benefits in response to liabilities incurred by a "Person Insured" resulting from "Bodily Injury" or "Property Damage" caused by an "Occurrence" and arising directly out of American Airlines' "Air Transportation Business." The definition of an "Insured" includes any person to whom American Airlines is obligated by contract to provide insurance.

11.     On February 26, 1990, American Airlines entered into an Airport Use Agreement and Premises Lease with MWAA to contract for the use and operation of certain space at Dulles International Airport (the "Lease"). Article 12 of the Lease obligates American Airlines to obtain insurance to cover liabilities arising out of American Airlines' use of the leased space, and requires American Airlines to list MWAA as an additional insured under that contract of insurance. American Airlines requested that MWAA be named as an additional insured under

the Policy issued by and through Global, and Global agreed to that request and arranged for MWAA to be named as an additional insured to the extent required under the Lease.

12.    Because MWAA was named as an additional insured under the Policy, and in light of the allegations in the Third Amended Complaint claiming that Plaintiffs have incurred injuries arising out of or in connection with American Airlines' use, occupancy and/or activities at Dulles International Airport, Global Aerospace agreed on February 28, 2007 to provide a defense on MWAA's behalf.

13.    In that same letter of February 28, 2006, however, Global Aerospace reserved its right to deny indemnification benefits to MWAA if, among other things, it was shown that MWAA's liability arose out of *its own acts of negligence*, as opposed to vicariously arising out of the negligent acts of American Airlines.

14.    Global Aerospace's reservation of rights was based, in part, on the express language of the Policy, as well as the express language of the Lease. Specifically, Article 12.01 of the Lease provides that American Airlines shall indemnify MWAA for claims "arising out of [American Airlines'] conduct of Air Transportation Business on the Airports, or in its use or occupancy of the Premises ... *except to the extent such injury, death or damage is caused by the negligent act or omission or willful misconduct of [MWAA]*." (emphasis added) Thus, pursuant to the explicit language of the Lease, no indemnification is provided for MWAA's own acts of negligence.

15.    Along the same lines, Article 12.03.2 of the Lease requires American Airlines to obtain insurance for MWAA's benefit to cover the indemnity obligations set forth in Article 12.01. The Policy, in turn, provides that MWAA is an additional insured, *but only to the extent of American Airlines' contractual obligations under the Lease.* This Policy language, therefore,

confirms that the scope of coverage was not intended to extend to MWAA's own acts of negligence.

16.    In its February 28, 2007 reservation of rights letter, Global Aerospace also stated that defense benefits for MWAA commenced on November 13, 2006, the date that MWAA first noticed, tendered and requested insurance coverage from Global Aerospace.  In conjunction therewith, Global Aerospace declined to reimburse MWAA for any defense costs that MWAA incurred prior to November 13, 2006.

17.    Global Aerospace's decision to limit reimbursement of defense costs was based, in part, on well known principles of insurance laws providing that an insurer's obligation to pay the costs of defense commences upon the date the insured first provides notice of the claim.  This is true regardless of whether the insurer has been prejudiced by any delayed notice by the insured.

18.    Moreover, Article 12.01 of the Lease required MWAA to give American Airlines "reasonable notice" of any claim for which it is seeking defense and indemnity benefits.  This obligation was reiterated in the Policy, which provides that any party purporting to be an insured and seeking coverage must provide notice to Global Aerospace "as soon as practicable," once a claim is filed against the insured.

19.    In this case, the claim for which MWAA seeks coverage was first filed on December 11, 2002.  For the next four years, MWAA conducted its own defense at its own expense and under its own control, without tendering a claim for indemnification to American Airlines or Global Aerospace.  When MWAA finally tendered its defense to Global Aerospace on November 13, 2006, such notice was late, unreasonable and in violation of the Lease and the Policy.  As such, any contractual obligation to reimburse MWAA for defense costs incurred prior to November 13, 2006 is void.

20.    MWAA has taken issue with the coverage positions and arguments adopted by Global Aerospace, insisting that it is entitled to full coverage under the Policy from the inception of the first Complaint, regardless of whether liability arose from its own acts of negligence or those of American Airlines.

21.    To date, the parties have been unable to resolve their differences of opinion.

## COUNT ONE
### (Declaratory Judgment)

22.    Global Aerospace restates and incorporates by reference the allegations contained in Paragraphs 1 through 21 above, as if fully set forth herein.

23.    An actual controversy of a justiciable nature presently exists between Global Aerospace and MWAA concerning whether MWAA is entitled to defense and indemnity benefits for liability arising out of its own negligent acts in connection with the Third Amended Complaint.

24.    Justice requires that this Court determine and settle by declaration the justiciable controversy between Global Aerospace and MWAA in order to relieve Global Aerospace from uncertainty with respect to its rights, status and legal relations owed under the Policy.

25.    Global Aerospace is entitled to a declaratory judgment that MWAA is not entitled to defense or indemnity for any liability arising from its own acts of negligence.

## COUNT TWO
### (Declaratory Judgment)

26.    Global Aerospace restates and incorporates by reference the allegations contained in Paragraphs 1 through 21 above, as if fully set forth herein.

27.    An actual controversy of a justiciable nature presently exists between Global Aerospace and MWAA concerning whether MWAA is entitled to reimbursement of defense

costs that MWAA incurred on its own behalf prior to November 13, 2006 in connection with the Third Amended Complaint.

28.    Justice requires that this Court determine and settle by declaration the justiciable controversy between Global Aerospace and MWAA in order to relieve Global Aerospace from uncertainty with respect to its rights, status and legal relations owed under the Policy.

29.    Global Aerospace is entitled to a declaratory judgment that MWAA is not entitled to reimbursement for defense costs that it incurred on its own behalf prior to November 13, 2006.

**COUNT THREE**
**(Breach of Contract)**

30.    Global Aerospace restates and incorporates by reference the allegations contained in Paragraphs 1 through 21 above, as if fully set forth herein.

31.    Pursuant to the terms of the Policy, any party purporting to be an insured and seeking coverage must provide notice to Global Aerospace "as soon as practicable," once a claim is filed against the insured.

32.    To the extent the Court determines that the Policy provides coverage for MWAA's benefit, MWAA has failed to meet its obligation to provide timely notice to Global Aerospace and/or American Airlines.

33.    MWAA's actions constitute a material breach of the Policy provisions.

34.    As a direct consequence of MWAA's breach, Global Aerospace has been damaged in an amount to be proven at trial.

**COUNT FOUR**
**(Breach of Contract)**

35.    Global Aerospace restates and incorporates by reference the allegations contained in Paragraphs 1 through 21 above, as if fully set forth herein.

36.    Pursuant to Article 12.01 of the Lease, MWAA was required to give "reasonable notice" of any claim for which it is seeking defense and indemnity benefits.

37.    To the extent the Court determines that the Policy provides coverage for MWAA's benefit, MWAA has failed to meet its obligation to provide reasonable notice to Global Aerospace and/or American Airlines.

38.    MWAA's actions constitute a material breach of the Lease provisions.

39.    As a direct consequence of MWAA's breach, Global Aerospace has been damaged in an amount to be proven at trial.


**WHEREFORE**, Global Aerospace respectfully requests that this Court:

(a)    Grant judgment to Global Aerospace and against MWAA as to Count One of the Complaint by entering an Order declaring that Global Aerospace is not obligated to defend or indemnify MWAA with regard to any claims in the Third Amended Complaint arising from MWAA's own acts of negligence;

(b)    Grant judgment to Global Aerospace and against MWAA as to Count Two of the Complaint by entering and order declaring that Global Aerospace is not obligated to reimburse MWAA for defense costs MWAA incurred prior to November 13, 2006;

(c)    Grant judgment to Global Aerospace and against MWAA as to Count Three of the Complaint by entering an Order finding that MWAA has breached material conditions and requirements of the Policy, and awarding Global Aerospace its consequential damages in an amount to be proven at trial;

(d)    Grant judgment to Global Aerospace and against MWAA as to Count Four of the Complaint by entering an Order finding that MWAA has breached material conditions and

requirements of the Lease, and awarding Global Aerospace its consequential damages in an amount to be proven at trial;

(e)    Award Global Aerospace its reasonable expenses of litigation incurred in connection with this lawsuit, including attorney fees;

(f)    Tax all costs of this lawsuit against MWAA; and

(g)    Grant Global Aerospace such additional relief as this Court deems just.


Requested this 9th day of October, 2007.

GREENBERG TRAURIG, LLP

Donald J. Detweiler (#3087)
*detweilerd@gtlaw.com*
Titania R. Mack (#4120)
*mackt@gtlaw.com*
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360

*Attorneys for Global Aerospace, Inc.*

OF COUNSEL:

Ronald Kleinman, Esq.
Timothy C. Bass, Esq.
GREENBERG TRAURIG, LLP
800 Connecticut Ave., Suite 500
Washington, D.C. 20006
Phone: (202) 331-3100
Fax: (202) 331-3101

 

Named Insured:  American Airlines, Inc.

Policy Number SP-6505

Insurance under this policy is provided by several separate insurers, hereinafter referred to as "the Company." The liability of these insurers is several and not joint and is specifically set out below.

## THE COMPANIES

Centennial Insurance Company
New York, New York



Greenwich Insurance Company
San Francisco, California



Continental Casualty Company
Long Grove, Illinois

Lumbermens Mutual Casualty Company
Toronto, Canada

Federal Insurance Company
Lincoln, Nebraska

Underwriters Insurance Company
Indianapolis, Indiana

*Leonidas G. Demas*

Leonidas G. Demas, Secretary
Associated Aviation Underwriters

*A. J. Medniuk*

A. J. Medniuk, President & C.E.O.
Associated Aviation Underwriters

Associated Aviation Underwriters has issued this policy on behalf of the Companies listed above. This policy is not valid unless signed by Associated Aviation Underwriters.

Associated Aviation Underwriters

 

Coinsurance Agreement for Policy Number SP-6505

**ASSOCIATED AVIATION UNDERWRITERS**
51 John F. Kennedy Parkway
Short Hills, New Jersey 07078

In consideration of the payment of the premium and of the terms set forth in the attached AIRLINE INSURANCE FORM AMR-2000 the Company does make insurance as follows:

| | |
|---|---|
| Named Insured: | AMR Corporation, American Airlines, Inc; all their subsidiary, affiliated, managed, owned or controlled companies (either directly or indirectly) now in existence or hereafter formed or acquired, jointly or severally, as their respective interests may appear. |
| Address: | P. O. Box 619616 Dallas/Fort Worth International Airport Texas 75261-9616 |
| Policy Period: | From 12:01 A. M. Central Standard Time, 1st December 2000 to 12:01 A. M. Central Standard Time, 1st December 2001 |

The insurance provided by this policy shall be in accordance with and subject to all provisions, conditions and limitations herein set forth and in the attached AIRLINE INSURANCE FORM AMR-2000 which is made a part of this policy.

This policy is effective to the extent of and is limited to ▮▮▮▮ part of 100% of the insurance described in AIRLINE INSURANCE FORM AMR-2000 and the premium for which this insurance is written is ▮▮▮▮ part of 100% of the premium in accordance with AIRLINE INSURANCE FORM AMR-2000.

The Lumbermens Mutual Casualty Company is a perpetual mutual corporation owned by and operated for the benefit of its members. This is a non-assessable, non-participating policy.

The Named Insured is hereby notified that by virtue of this policy the Named Insured is a member of Lumbermens Mutual Casualty Company and is entitled to vote either in person or by proxy at any and all meetings of Lumbermens Mutual Casualty Company. The annual meeting of the Lumbermens Mutual Casualty Company is held at its home office in Long Grove, IL on the third Tuesday in May of each year at eleven o'clock A.M.

The Company has caused this policy to be executed on its behalf by its authorized officers, but it shall not be valid unless attached when issued to AIRLINE INSURANCE FORM AMR-2000 and approved by Associated Aviation Underwriters

Associated Aviation Underwriters

TABLE OF CONTENTS

POLICY NUMBER SP-6505

DECLARATIONS.................................................................................................... 1

PART I - PHYSICAL DAMAGE
    INSURING AGREEMENTS

| | | |
|---|---|---|
| I. | COVERAGES | |
| II. | LIABILITY OF THE COMPANY | 1 |
| III. | AIRCRAFT HULL DEDUCTIBLES | 2 |
| IV. | AGREED VALUE OF AIRCRAFT | 2 |
| V. | LOSS PAYABLE | 3 |
| VI. | TURBINE ENGINES - INGESTION | 3 |
| VII. | SUPPLEMENTARY EXPENSES | 4 |

EXCLUSIONS .................................................................................................. 5

DEFINITIONS .................................................................................................. 6

CONDITIONS

| | | |
|---|---|---|
| 1. | INSURED AIRCRAFT | 7 |
| 2. | APPROVED PILOTS | 7 |
| 3. | AUTOMATIC REINSTATEMENT | 7 |
| 4. | PROMPT NOTICE OF LOSS | 7 |
| 5. | PROTECTION OF SALVAGE | 8 |
| 6. | STATEMENT OF LOSS | 8 |
| 7. | CLAIMS TO BE MADE SEPARATELY AND SUPPORTED BY RECORDS | 8 |
| 8. | APPRAISAL | 8 |
| 9. | SALVAGE OR ABANDONMENT | 9 |
| 10. | PAYMENT OF LOSS | 9 |

TABLE OF CONTENTS (Continuation)

PART II - COMPREHENSIVE AIRLINE LIABILITY

INSURING AGREEMENTS

I.   BODILY INJURY, PROPERTY DAMAGE AND PERSONAL INJURY COVERAGES ................................................. 10

II.   PASSENGERS' PERSONAL EFFECTS ............................................... 11

III.   SUPPLEMENTARY PAYMENTS ...................................................... 11

IV.   PERSONS INSURED ...................................................................... 12

V.   LIMITS OF LIABILITY ................................................................... 13

VI   SEVERABILITY OF INTERESTS; CROSS LIABILITY ........................... 14

VII.   UNDERLYING INSURANCE .......................................................... 14

VIII.   BAGGAGE AND PERSONAL EFFECTS DEDUCTIBLE ........................ 17

EXCLUSIONS ............................................................................................ 18

DEFINITIONS ........................................................................................... 23

CONDITIONS

1.   FINANCIAL RESPONSIBILITY LAWS ............................................. 26

2.   INSURED'S DUTIES IN THE EVENT OF OCCURRENCE, OFFENCE, CLAIM OR SUIT ........................................................................ 26

3.   CONFORMITY WITH REGULATIONS ............................................ 26


GENERAL CONDITIONS

1.   PREMIUM .................................................................................. 27

2.   INSPECTION OF PROPERTY INSURED AND AUDIT ......................... 27

3.   ACTION AGAINST THE COMPANY ................................................ 27

4.   ASSISTANCE AND CO-OPERATION OF THE INSURED ..................... 28

5.   CONTRACTUAL AGREEMENTS .................................................... 28

6.   SUBROGATION ......................................................................... 29

7.   SETTLEMENT WITHOUT COMPANY'S CONSENT ........................... 29

8.   CANCELLATION ........................................................................ 30

9.   ASSIGNMENT ........................................................................... 30

10.   CHANGES ................................................................................ 30

11.   OTHER INSURANCE .................................................................. 30

12.   VIOLATION OF PROVISIONS ...................................................... 31

13.   NOTIFICATION REQUIREMENTS ................................................ 31

14.   CHOICE OF LAW ...................................................................... 31

15.   DECLARATIONS ........................................................................ 31



TABLE OF CONTENTS (Continuation)

ENDORSEMENTS

1. WAR, HI-JACKING AND OTHER PERILS EXCLUSION CLAUSE (AVIATION) AVN.48B

2. EXTENDED COVERAGE ENDORSEMENT (AIRCRAFT HULLS) AVN.51 (AMENDED)

3. EXTENDED COVERAGE ENDORSEMENT (AIRCRAFT LIABILITIES) AVN.52C (AMENDED)

4. CANADIAN NATIONAL TRANSPORTATION AGENCY AIR TRANSPORTATION REGULATIONS

5. C.A.B. REGULATIONS ER-1253 CFR PART 205

6. DENIED BOARDING/OVERBOOKING

7. GERMAN AIR LAW

8. 50/50 PROVISIONAL CLAIMS SETTLEMENT CLAUSE

9. AIR MOBILITY COMMAND

10. GROUNDING LIABILITY COVERAGE

11. AIR TRANSPORTATION BUSINESS

12. PASSENGER INTERRUPTED FLIGHT COVERAGE

13. CONTINGENT COVERAGES

14. SPARES COVERAGE ENDORSEMENT

15. BUYER FURNISHED EQUIPMENT

16. CIVIL AVIATION (CARRIERS' LIABILITY) AUSTRALIA

17. AIR NAVIGATION ACT (SWITZERLAND)

18. ELECTRONIC DATE RECOGNITION EXCLUSION (AAU 200)

19. ELECTRONIC DATE RECOGNITION LIMITED COVERAGE ENDORSEMENT

20. EXCESS LIABILITY - SPECIAL PROVISIONS

21. IN FLIGHT HANGARKEEPERS LIABILITY COVERAGE

 

AIRLINE HULL, SPARES AND COMPREHENSIVE LIABILITY INSURANCE

Attached to and made part of Policy Number SP-6505

DECLARATIONS

1. Named Insured: AMR Corporation, American Airlines, Inc; all their subsidiary, affiliated, managed, owned or controlled companies (either directly or indirectly) now in existence or hereafter formed or acquired, jointly or severally, as their respective interests may appear.

2. Address of Insured: P.O. Box 619616
Dallas/Fort Worth International Airport
Texas 75261-9616

3. Policy Period: From 12:01 A. M. Central Standard Time, 1st December 2000
to 12:01 A. M. Central Standard Time, 1st December 2001

PART I - PHYSICAL DAMAGE

INSURING AGREEMENTS - PART I

I.    COVERAGES

    A.    To pay for all physical loss of or damage to the Aircraft sustained during the policy period, including disappearance if the Aircraft disappears after take off and is not located nor its whereabouts reported within seven days.

    B.    To pay all general average and salvage charges, if any, legally assessed against the insured Aircraft and/or the Named Insured and/or the owners in respect thereof, but in no event shall the Company's liability under this COVERAGE B, plus their liability under the terms and conditions of this policy, exceed the limits of liability expressed elsewhere in this policy.

II.    LIABILITY OF THE COMPANY

Subject to the applicable deductibles to be borne by the Named Insured and to the other terms and conditions of this policy, the Company's liability for loss or damage to the Aircraft covered by the policy shall be;

    A.    in the event of a loss adjusted on the basis of a total loss, constructive total loss or arranged total loss, the Agreed Value as set forth elsewhere in the policy, or

1



B.   in the event of partial loss, when repairs are made by the Named Insured; the actual cost of any part(s) necessary to effect repairs or replacements plus the actual cost to the Named Insured of labour plus ███ of the cost of such labour without any further allowances for overhead or overtime. If the repairs are made by other than the Named Insured, the liability of the Company shall not exceed the actual cost as evidenced by bills rendered to the Named Insured less any discounts granted to the Named Insured. The Company agrees to assume Reasonable Transportation Charges as herein defined. In no event shall the liability of the Company for partial loss exceed the amount for which the Company would be liable if the Aircraft were a total loss.

III.   AIRCRAFT HULL DEDUCTIBLES

With respect to each and every loss covered hereunder, except with respect to loss adjusted on the basis of a total loss, a constructive total loss, or an arranged total loss the Named Insured shall bear the first amount of each and every loss as follows:

A.   Wide body Jet Aircraft:
      including DC10, B757/767, B777,
      A300 and MD11

B.   Hybrid Jet Aircraft:
      including MD80/90, B737

C.   Narrow body Jet Aircraft:
      including B727, and Fokker 100

D.   Embraer 145/135

E.   ATR 42/72 and SAAB340

F.   Shorts SD3-60 and Jet Stream 31



Nevertheless in the event of an occurrence involving the application of more than one deductible to one or more Aircraft insured hereunder, then the highest single applicable deductible shall be applied as an aggregate deductible for all losses arising out of that occurrence.

The liability of the Company shall not in any event exceed the Agreed Value of the Aircraft at the time any loss occurs, less any applicable deductible, except as provided under Insuring Agreement VII.

IV.   AGREED VALUE OF AIRCRAFT

A.   The Agreed Values, unless otherwise advised by the Named Insured, shall be:

      i)   for owned airframes and engine and other parts, the ███████████ of such owned airframe and engines (whether or not subject to a mortgage, conditional sales agreement or other form of financing), including the ███ of improvements/modifications/betterments to such owned airframes and engines. (or, if greater, the amount required to be insured in any applicable financing document) and

2



    ii)    for leased airframes and engine and other parts, the ▮▮▮▮▮▮▮▮▮▮▮ or other amount required to be insured as set forth in the applicable financing document for such leased airframes or engines plus the ▮▮▮▮ of improvements/modifications/betterments to such leased airframes and engines.

▮▮▮▮▮shall be the amount as of the last day of the month for the month preceding any occurrence as appearing in American Airlines Fixes Asset Management System, commonly known as AM.

B.    If the Named Insured is not the owner of the Aircraft, and no Agreed Value is set forth in the contract under which the Named Insured has agreed to be responsible for physical loss or damage, then, unless otherwise agreed, the Agreed Value shall be the cost to replace the Aircraft with aircraft of like kind and quality.

But in no event exceeding ▮▮▮▮▮▮▮▮▮any one Aircraft; and the Named Insured agrees to notify the Company of the purchase, leasing or chartering of any aircraft within 90 days after receipt of notice by the Named Insured's Insurance Department that the risk of loss for the Aircraft passes to the Named Insured but the failure of the Named Insured to so notify the Company shall not prejudice the coverage afforded by this policy.

The Company agrees to automatically increase or reduce the Agreed Value of any Aircraft in accordance with the provisions of this Insuring Agreement IV., but in no event shall the value of any one Aircraft exceed ▮▮▮▮▮▮▮▮

## V.    LOSS PAYABLE

Loss, if any, under this policy, unless otherwise provided in the policy, shall be adjusted with and made payable to American Airlines, Inc. or as so requested by American Airlines, Inc.

## VI.    TURBINE ENGINES - INGESTION

Damage to turbine engines or their accessories within the engine pod resulting from the ingestion of or the presence within the engine pod of grit, dust, sand, ice, fluid or any corrosive or abrasive material which has a progressive or cumulative effect or which has accumulated will be regarded as "wear and tear" and "deterioration" and is excluded; but damage attributable to a single recorded incident of unexpected ingestion and damage attributable to a single recorded incident resulting from the presence of a foreign object which ingestion of foreign object causes immediate damage which, if its severity were known, would require immediate engine removal, is covered subject to the EXCLUSIONS, CONDITIONS and other terms of this policy; provided further, that with respect to each such loss the Named Insured shall bear first an amount as stated in INSURING AGREEMENT III - DEDUCTIBLES and the Company will pay with respect to such loss only the amount by which the Company's liability with respect to such loss as provided by other terms of this policy exceeds the said DEDUCTIBLES. Loss or damage which is detected during inspection, maintenance, performance monitoring and the like, which is attributable to a single incident causing sudden damage shall be deemed to be "recorded" within the meaning of this Insuring Agreement VI.

VII.  **SUPPLEMENTARY EXPENSES**

The Company will pay in addition to the applicable limit of liabilities under PART I expenses incurred by the Named Insured for the purposes of:

(a)  search and rescue operations for an Aircraft insured hereunder determined to be missing and unreported after the computed maximum endurance of the Flight has been exceeded, or

(b)  removal, any attempted or actual raising, disposal or destruction of wreckage of an Aircraft insured hereunder, or

(c)  the foaming of a runway to prevent or mitigate possible loss or damage to an Aircraft insured hereunder and other fire and crash control action

(d)  any public enquiry arising out of an Occurrence

provided, however, with respect to paragraphs (a) to (d) above, the Company's limit of liability therefor shall not exceed ▮▮▮▮▮▮▮ each category ▮▮▮▮▮▮▮ any one loss. However, the foregoing Supplementary Expenses shall not apply to expenses

(1)  which are payable under PART II of this policy; or

(2)  for which the Named Insured would be reimbursed otherwise; or

(3)  to the extent recoverable under any other insurance policy of the Named Insured.


VIII.  **AIRCRAFT FLIGHT SPARES KITS**

The Company will pay in addition to the applicable limit of liabilities under PART I up to a maximum of ▮▮▮▮▮▮▮ for aircraft flight spares kits whilst on board the aircraft or whilst temporary removed and not replaced. This coverage is in addition to the aircraft Agreed Value and subject to a deductible of ▮▮▮▮▮ each and every occurrence other than losses arising out of an accident to the aircraft.

## EXCLUSIONS - PART I

Unless otherwise provided by agreement in writing added hereto, the Company shall not be liable under this PART I for loss or damage;

1.  due to and confined to wear and tear, deterioration, malfunction, defect, freezing or mechanical, electrical or structural breakdown or failure unless such loss or damage results from other loss or damage covered by this policy; without in any way limiting the scope of the foregoing provision, it is specifically understood and agreed that damage to turbine engines or their accessories within the engine pod due to excessive heating from a source within the engine resulting from starting, attempted starting, testing, running up or shutting down the engine shall be conclusively presumed to be due and confined to wear and tear:

2.  to any Aircraft occurring during the period such Aircraft is leased to parties other than the Named Insured to be operated by air crews other than air crews in the employ of the Named Insured, unless the Named Insured has agreed under contract to provide coverage therefor, but only to the extent required by the terms of said contract.

## DEFINITIONS - PART I

For the purpose of the policy, the following terms shall be held to mean;

A.  "Flight" means the period commencing with the start of the actual takeoff run, while in the air, and until completion of the landing run.

B.  "Federal Aviation Administration" or "FAA" means the duly constituted authority of the United States having jurisdiction over civil aviation, or the equivalent authority of any nation.

C.  "Reasonable Transportation Charges" means the cost of the least expensive, reasonably available means of transporting new or damaged parts, or transporting the damaged Aircraft, to the place of repair.

D.  "Named Insured's insurance department" means American Airlines, Inc.'s Insurance Department located at Corporate Headquarters, 4333 Amon Carter Blvd., Fort Worth, Texas 76155.

E.  "Aircraft" means the aircraft described in CONDITION 1. of this PART I including the engines, passenger entertainment systems and heads-up displays, other parts and equipment (all hereinafter called "parts") attached thereto or carried thereon in its usual and customary use and including all parts of such aircraft when such aircraft are disassembled or such parts are removed, provided such part is not replaced with a similar part. If such part is replaced, the replacement part shall be considered a part of the aircraft as of the moment installation of such part begins and the part replaced shall cease to be considered a part of such aircraft.

CONDITIONS - PART I

1.  **INSURED AIRCRAFT**

    All Aircraft owned by or operated by the Named Insured, or leased or chartered to the Named Insured or any Aircraft for which the Named Insured, has agreed, prior to loss, to be responsible for physical loss or damage.

2.  **APPROVED PILOTS**

    (a) The pilot in command of the insured's Aircraft while in flight will be properly certificated by the Federal Aviation Administration and approved by an authorised representative of the Named Insured.

    (b) Aircraft to which this policy applies and which are assigned to the Civil Reserve Air Fleet and upon activation of such Aircraft under Civil Reserve Air Fleet operations will be operated in Flight by pilots qualified by Federal Aviation Regulations to operate the Aircraft to be flown who are in the regular employ of any United States scheduled air carrier that has Aircraft assigned to the Civil Reserve Air Fleet.

    The coverage under this policy shall not be prejudiced in the event that, without the knowledge and consent of any officer of the Named Insured, the pilot in command is not properly certificated and approved, or in the event said pilot is in command of the Aircraft without the consent of the Named Insured.

3.  **AUTOMATIC REINSTATEMENT**

    In the event of loss or damage, whether or not covered by this policy, the Agreed Value of the Aircraft involved shall be reduced by the amount of such loss or damage, but the amount of such loss or damage shall be reinstated automatically as repairs are effected until completed, at which time the Agreed Value of the Aircraft shall be as stated in Insuring Agreement IV, without additional premium.

4.  **PROMPT NOTICE OF LOSS**

    In the event of loss or damage covered hereby, unless the amount thereof in the opinion of the Named Insured appears to be less than the applicable deductible herein before referred to, notice thereof shall be given to Associated Aviation Underwriters, Attention: Claims Department by telegram, facsimile or telephone, or if sent by mail to: 51 John F. Kennedy Parkway, Short Hills, New Jersey 07078, as soon as practicable after it has come to the knowledge of the Named Insured's Insurance Department. Such notice shall identify the Aircraft involved by its registration number, name or make and shall state the estimated extent of the loss or damage, and the Named Insured shall forward within a reasonable time thereafter full particulars in writing of the loss or damage.

7

5. **PROTECTION OF SALVAGE**

In the event of any loss or damage, whether insured against hereunder or not, the Named Insured shall take reasonable measures to protect the property from other or further loss or damage, and any such other or further loss or damage due directly or indirectly to failure of the Named Insured to so protect the property shall not be recoverable under this policy. Any such act of the Named Insured or the Company or its agents in recovering, saving and preserving the property described herein, shall be considered as done for the benefit of all concerned and without prejudice to the rights of either party, and where the loss or damage suffered constitutes a claim under this policy, then all reasonable expenses thus incurred shall also constitute a claim under this policy, provided, however, that the Company shall not be responsible for the payment of a reward offered for the recovery of the insured's property unless authorized by the Company.

6. **STATEMENT OF LOSS**

Within sixty (60) days after loss or damage comes to the attention of the Named Insured's Insurance Department, unless such time is extended in writing by the Company, the Named Insured shall render a statement to the Company signed and sworn to by the Named Insured, stating the place, time and cause of the loss or damage, the interest of the Named Insured and of all others in the property, the amount of loss or damage thereto, all encumbrances thereon, and all other insurance, whether valid and/or collectible or not, covering said property; and the Named Insured, as often as may reasonably be required, shall exhibit to any person designated by the Company all that remains of the property insured and submit to examination under oath by any person named by the Company and subscribe the same, and as often as may be reasonably required, shall produce for examination all books of account, bills, invoices, and other vouchers, or certified copies thereof if originals be lost, at such reasonable place as may be designated by the Company or its representatives, and shall permit extracts and copies thereof to be made. With respect to partial losses, the Named Insured may at its election render the aforementioned statement within sixty (60) days after the completion of repairs.

7. **CLAIMS TO BE MADE SEPARATELY AND SUPPORTED BY RECORDS**

Claims must be made separately for each accident and each Aircraft and be supported by records of the Named Insured, kept in order as required by the Federal Aviation Administration.

8. **APPRAISAL**

In case the Named Insured and the Company shall fail to agree as to the amount of loss or damage each shall as promptly as practicable after the written demand of either, select an appraiser. The appraisers shall first select a competent and disinterested umpire; and failing for 15 days to agree upon such umpire then, on request of the Named Insured or the Company, such umpire shall be selected by a judge of a Court of Record in the State in which the property insured is located or, if such property is located outside of the United States, by a tribunal of competent jurisdiction reasonably satisfactory to the Company and the Named Insured. The appraisers shall, within 20 days of their selection or as soon as practicable thereafter, appraise the loss or damage, stating separately the condition of the equipment prior to the loss, the loss or damage sustained in the incident with respect to which claim has been made and any betterment involved in repair, with respect to each item; and failing to agree, shall submit their differences only, to the umpire, who shall resolve any such differences within 7 days of their submission or as soon as practicable thereafter. An award in writing, so itemized, of any two persons among the appraisers and the umpire when filed with the Company shall determine such amounts of loss, damage or betterment. Each appraiser shall be paid by the party selecting him and the expenses of appraisal and umpire shall be paid by the parties equally.

8

9. SALVAGE OR ABANDONMENT

Whenever the amount of loss or damage paid is equal to the amount payable with respect to total loss of the Aircraft, any salvage value remaining shall inure to the benefit of the Company in full, regardless of any total loss only or excess valuation coverages that may apply and claim salvage rights; there cannot be, however, any abandonment thereof to the Company without their consent.

10. PAYMENT OF LOSS

The Company shall not be held to have waived any provision or condition of this policy or any forfeiture thereof by any requirement, act or proceeding on its part relating to an appraisal, or to any examination herein provided for; and the Named Insured shall in no event have the right to demand payment of the loss until fifteen (15) days after the statement of loss required by 6. STATEMENT OF LOSS above has been received by the Company, and if appraisal is demanded, then not until fifteen (15) days after an award has been made by the appraisers. The Company agrees to make payment of any loss due hereunder within thirty (30) days (or fifteen (15) days in respect of total loss, constructive total loss or arranged total loss) of receipt by the Company of such a statement of loss, or if appraisal is demanded, within thirty (30) days (or fifteen (15) days in respect of total loss, constructive total loss or arranged total loss) after an award has been made by the appraisers.

9

PART II - COMPREHENSIVE AIRLINE LIABILITY

INSURING AGREEMENTS - PART II

I.     BODILY INJURY, PROPERTY DAMAGE AND PERSONAL INJURY COVERAGES;

The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as Damages directly arising out of the Air Transportation Business of the Named Insured because of:

A.     Bodily Injury or Property Damage caused by an Occurrence, and

B.     Personal Injury arising out of one or more of the following offences if such offence is committed during the policy period;

Group 1.     False arrest or imprisonment, delay, detention, malicious prosecution, wrongful entry to or eviction from any premises or aircraft or vehicle or other invasion of the right of private occupancy;

Group 2.     Withholding, or refusal, or oversale, or delay, or removal, or misinformation or misdirection of persons or property in connection with providing transportation or other public accommodations for such persons or property;

Group 3.     The publication or utterance of a libel or slander or of other defamatory or disparaging material or a publication or utterance in violation of a person's or organization's right of privacy or subjection of any person or organization to ridicule or humiliation;

Group 4.     Discrimination in connection with the Named Insured's activities provided that such discriminatory act is not committed at the direction of, or with the knowledge and/or approval of the Named Insured, a corporate officer of the Named Insured or a director of the Named Insured:

Group 5.     Medical malpractice, error, or mistake by any physician, surgeon, nurse, medical technician or other person performing medical services for or on behalf of a Named Insured in the provision of immediate medical and/or surgical relief.  In addition, medical services performed by the Named Insured's staff or by others in connection with routine physical exams, including pre-employment and injury related medical exams, or other work related medical services but with regard to medical services provided by others, the coverage afforded hereunder applies only to the Named Insured's contingent liability arising out of such services:

Group 6.     Injury to the means of support of any person or any other Damages resulting from the giving or selling of alcoholic beverages:

Group 7.     Any negligent act, error or omission of the Named Insured or any other person for whose acts the Named Insured is legally liable in the conduct of travel agency and/or tour operations by or on behalf of the Named Insured, other than Bodily Injury, Property Damage or Personal Injury for which coverage is provided elsewhere in this policy;

including any consequential loss resulting from any of the foregoing.

10



The Company shall have the right and duty to defend any suit against the Insured seeking Damages on account of such Bodily Injury, Property Damage or Personal Injury even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as deemed expedient, provided always that the Company shall not at any time prejudice the interests of the Insured in the course thereof, but the Company shall not be obligated to pay any claim or judgement or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgements or settlements.

If a claim is made or a suit is brought in any jurisdiction where the Company is precluded by law from investigating, settling or defending such claim or suit, the Insured, under the supervision of the Company will make or cause to be made such investigation and defence as are reasonably necessary, and subject to prior authorisation by the Company, will effect to the extent possible such settlements as the Company deem prudent. The Company shall reimburse the Insured for the reasonable costs of such investigation and defence, in addition to the applicable limits of liability of the Policy for the amount of such authorised settlements, subject to INSURING AGREEMENT III, SUPPLEMENTARY PAYMENTS.

II.    PASSENGERS' PERSONAL EFFECTS

Such insurance as is afforded under COVERAGE A. of INSURING AGREEMENT I. as respects Property Damage is extended to apply to delay or failure in the delivery and the resultant loss of use of personal property belonging to or in the charge of Passengers in connection with a flight or intended flight on aircraft operated by or in the interest of the Named Insured. This Insuring Agreement II is also extended to apply to crew personal property on an all risk basis.

III.    SUPPLEMENTARY PAYMENTS

(A)    The Company will pay in addition to the applicable limit of liability;

1.    all expenses incurred by the Company, all costs taxed against the Insured in any suit defended by the Company, and all interest on the entire amount of any judgement therein which accrues after entry of the judgement and before the Company has paid or tendered or deposited in court that part of the judgement which does not exceed the limit of the Company liability thereon.

2.    premiums on any bonds required by the law of any state or foreign jurisdiction as security for the payment of any judgement covered by this policy, including premiums on appeals bonds or bonds to release attachments, for an amount not in excess of the applicable limit of liability of this policy, in connection with any suit defended by the Company, and the cost of bail bonds required of the Insured because of an accident or violation of a law or regulation arising out of the use of any aircraft or vehicle to which this policy applies, not to exceed ████████ bail bond, but the Company shall have no obligation to apply for or furnish any such bonds.

3.    expenses incurred by the Insured for first aid to others at the time of an Occurrence to which this policy applies; also repatriation, funeral, burial and related expenses arising out of such Occurrence including transportation of a relative or friend of a person injured or killed in an Occurrence to and from a place near the scene of such an Occurrence and reasonable hotel and living expenses incurred in connection therewith.

4.    reasonable expenses incurred by the Insured at the Company's request or with the Company's agreement, other than loss of income, including actual loss of wages or salary by an individual person who is an Insured (but not loss of other income) not to exceed ██████ ████ because of his appearance at hearings or trials at such request.

11

5.  expenses arising out of the requirements of the Family Assistance Act and including any amendments thereto, the Principals of Understanding between the ATA and NTSB dated October 1999 including any amendments thereto and cost and expenses arising out of the use of an emergency procedures centre and/or crisis management centre following a loss covered hereon including costs and expenses incurred in providing humanitarian support services to passengers, third parties and/or their relatives including the Named Insured's use of Customer Assistance Relief Personnel (C.A.R.E) to be agreed by the Company.

(B)  SUPPLEMENTARY PAYMENTS where UNDERLYING INSURANCE exists:

Notwithstanding subparagraphs 1. through 4. inclusive of Paragraph (A) of this INSURING AGREEMENT III., in the event of a claim occurring likely to exceed the limits of the UNDERLYING INSURANCE as set out in INSURING AGREEMENT VII., no costs shall be incurred without the consent of the Company which consent shall not be unreasonably withheld.

Should the claim become adjustable previous to going into court for a sum of not more than the limits of the Primary UNDERLYING INSURANCE, then no costs or SUPPLEMENTARY PAYMENTS shall be payable by the Company unless incurred at the Company's request.

Should, however, the sum for which the said claim or claims may be so adjustable exceed the limits of the Primary UNDERLYING INSURANCE then the Company, if consenting to the continuation of the proceedings, shall contribute to the costs or SUPPLEMENTARY PAYMENTS in the ratio that its proportion of the liability for the judgement rendered or settlement bears to the whole amount of the said judgement or settlement.

In the event that the Underlying Insurers elect not to appeal a judgement in excess of their limits of liability, the Company may elect to conduct such appeal at their own cost and expense and shall be liable for the taxable costs and interest incidental thereto, but in no event shall the total liability of the Company exceed the limits of the Company's liability as set forth in INSURING AGREEMENT V., plus the expense of such appeal.

IV.  PERSONS INSURED

Each of the following is an Insured under this insurance to the extent set forth below:

(a)  the Named Insured;

(b)  (i)  any officer or employee of the Named Insured while acting within the scope of his employment and/or on behalf of his employer,

    (ii)  any partner, director or stockholder acting on behalf of the Named Insured,

(c)  any airline with which the Named Insured may have an interline agreement and any railroad, steamship line, bus line, airline or ticket agency acting as an agent of the Named Insured in the sale of services over the routes of the Named Insured, while acting within the scope of its duties as such agent;

(d)  any additional Insured included in any Underlying Insurances, but not for broader coverage than is available to such additional Insured under any Underlying Insurances;

(e)  any person, organization, trustee or estate to whom the Named Insured is obligated by virtue of a Contract or agreement to provide insurance such as is afforded by this Policy, but only to the extent of such obligation;

12



(f)     any partnership; or joint venture in which the Named Insured has an interest but only if the Company is notified within 45 days of the date on which such interest became effective, and the Company will determine additional premium due, if any. However, if through error or omission the Named Insured fails to notify the Company of such partnership or joint venture, such failure to notify shall not invalidate the insurance;

(g)     any person using or riding in an aircraft or any person legally responsible for the use of an aircraft used in such operations as set forth in paragraph (c) above, provided the actual use is by or with the permission of the Named Insured;

(h)     any organization or proprietor with respect to real estate management for the Named Insured.

(I)     at the sole option of the Named Insured, any person who responds to a request by an employee of the Named Insured for medical assistance for a passenger or non-passenger.

V.     LIMITS OF LIABILITY

(A) Regardless of the number of

(1)   Insureds under this policy,

(2)   Persons or organizations who sustain Bodily Injury, Property Damage or Personal Injury, or

(3)   Claims made or suits brought on account of Bodily Injury, Property Damage or Personal Injury.

The Company's liability is limited as follows:

(i)     The total liability of the Company for all Damages because of all Bodily Injury, Property Damage and Personal Injury sustained by one or more persons or organizations as the result of any one Occurrence shall not exceed ███████████  In the event more than one aircraft insured under this policy is involved in any one Occurrence, the limit of liability shall apply separately to each aircraft.

(ii)    With respect to INSURING AGREEMENT VII. - UNDERLYING INSURANCE, the Company Limit of Liability shall not exceed ██████████ any one Occurrence with respect to the items scheduled thereunder as (a) Automobile Liability, except with respect to Passengers and to any Automobile on airport premises (b) Employers Liability, except with respect to an Occurrence arising out of an aircraft accident in which case such sublimit does not apply to employees meeting the policy definition of Passengers, other than employees serving as flight and cabin crew members aboard said aircraft; (e) General Liability, with respect to the entities listed under this item, except with respect to any Occurrence which arises out of the activities falling within the definition of Air Transportation Business herein;(f) Foreign General Liability, with respect to the entities listed under this item, except with respect to any Occurrence which arises out of the activities falling within the definition of Air Transportation Business herein, (g) Advertisers' Liability and (h) Travel Agents Professional Liability; except with respect to any Occurrence which arises out of the activities falling within the definition of Air Transportation Business herein, such limit to apply as part of and not in addition to the Limits of Liability set forth in paragraph (i) above.

13

(iii) With respect to COVERAGE B. of INSURING AGREEMENT I., Groups 1. thru 7. inclusive, the Company Limit of Liability shall not exceed ▇▇▇▇▇▇▇except with respect to Passengers or to Bodily Injury or Property Damage for which the Company is liable under PART II, INSURING AGREEMENT IA. (as part of and not in addition to the Limits of Liability set forth above).

(B) Subject to the total limit for any one Occurrence as set forth in the preceding paragraph (A) of this INSURING AGREEMENT V., the total limit of the Company's liability for all Damages on account of all Occurrences occurring during the policy period shall not exceed the following:

(1) ▇▇▇▇▇▇ as respects COVERAGE B, Groups 1. through 7. inclusive, separately each offence, however such sublimits shall not apply with respect to Passengers or to Bodily Injury or Property Damage for which the Company is liable under Part II. Insuring Agreement I.A.

(2) ▇▇▇▇▇▇ as respects COVERAGE B., Groups 1. through 7. inclusive with respect to Passengers.

(3) ▇▇▇▇▇▇ as respects the Products Hazard and the completed operations hazard, combined.

(C) For the purpose of determining the limit of the Company's liability

(1) all Bodily Injury, Property Damage and Personal Injury arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one Occurrence;

(2) all Personal Injury sustained by one person or organization shall be considered as arising out of one Occurrence and if such person or organization makes or has made claim for Bodily Injury or Property Damage, the Personal Injury shall be considered as arising out of the same Occurrence giving rise to the claim for Bodily Injury or Property Damage.

VI. SEVERABILITY OF INTERESTS; CROSS LIABILITY

This insurance shall provide the same protection to each Insured hereunder as would have been available had this policy been issued separately to each Insured, except that in no event shall the Company's total liability exceed the limits of liability set forth in INSURING AGREEMENT V.

VII. UNDERLYING INSURANCE

A. It is understood that the Named Insured has effected and will maintain the following Primary Underlying Insurance;

| COVERAGE | LIMIT OF LIABILITY |
|---|---|
| (a) Automobile Liability | ▇▇▇▇▇▇any one accident. |
| (b) Statutory Workers' Compensation and Employers' Liability | Employer's Liability Limited to ▇▇▇▇▇▇ any one occurrence. |
| (c) Cargo Liability | ▇▇▇▇▇▇any one loss. |

14



COVERAGE                           LIMIT OF LIABILITY

d)  Shipper's Interest                  ████████ any one loss.

(e)  General Liability with respects to:  ████████ any one occurrence and
                                        ███ in the aggregate as applicable
                                        (other than Products and Completed Operations).

                                        ████████ any one occurrence and in the
                                        aggregate as applicable as respects Products
                                        and Completed Operations.

(f)  Foreign General Liability as respects:  ████████ any one occurrence and
     entities as listed above in (e) above   ███ in the aggregate as applicable.

(g)  Advertisers' Liability             ████████ any one occurrence and in the
                                        aggregate as applicable.

(h)  Travel Agents Professional Liability  ████████ any one loss and in the
                                        aggregate as applicable.

and the insurance afforded by this policy shall be excess insurance only with respect to such Primary Underlying Insurance.

It is hereby understood and agreed, however, that in the event the Insured suffers a loss which is covered under the policies of Primary Underlying Insurances, the excess of which would be payable under this Policy, except for terms and conditions of this Policy which are not consistent with the Primary Underlying Insurances, then notwithstanding anything contained in this Policy to the contrary this Policy shall be amended to follow and be subject to the terms and conditions of such Primary Underlying Insurances in respect of such paid loss.

In the event of reduction or exhaustion of the aggregate limit of liability under any such Primary Underlying Insurance by reason of losses paid thereunder this insurance shall;

(1)  in the event of reduction, pay the excess of the reduced Primary Underlying limit, or

(2)  in the event of exhaustion continue in force as Primary Insurance.

15



Where the limits of liability for the Primary Underlying Insurance are aggregate, subject to reduction or exhaustion by reason of losses paid thereunder, the liability of the Company under this INSURING AGREEMENT VII. in excess of the amount of such Primary Underlying Insurance shall not exceed in the aggregate the amount set forth elsewhere in this policy as applicable to each Occurrence.

Whereas, the period of the Primary and/or Underlying policy or policies, including renewals or replacements thereof, with respect to which this policy applies in excess, is or may be noncurrent with the period of this policy, in the event of reduction or exhaustion of the aggregate limit or limits contained in such Primary and/or Underlying policy or policies solely by payment of losses in respect to accidents or Occurrences during the period of such Primary and/or Underlying policy or policies, such insurance as is afforded by this policy shall apply in excess of the reduced underlying limit.

Failure of the Named Insured to maintain the Primary Underlying Insurance in full force and effect shall not invalidate the insurance afforded under this provision, but in the event of such failure, the Company shall be liable only to the same extent as they would have been had the Named Insured maintained the last applicable policy of Primary Underlying Insurance for the limits shown herein.  In the event the Named Insured maintains higher limits than scheduled herein then the Company shall only be liable for losses in excess of such higher primary underlying limits

B. It is understood that the Named Insured has also effected the following Underlying Insurance:

| COVERAGE | LIMIT OF LIABILITY |
|---|---|
| (a) Mexican Statutory Aircraft Liability | As required |
| (b) Aviation/Comprehensive General Liability in respect of FBO Operations of AMR Combs, Inc.. and any other such similar operations the Named Insured may acquire and██████████ | ██████████any Occurrence and in the aggregate as applicable, also sublimits as set forth under████████ ██████r renewal thereof. |
| (c) Aviation Premises, Hangarkeepers Products and Completed Operations Liability Insurance in respect of ████████████████████████████████████████████████████████████ | ██████████any one Occurrence/each aircraft and in the aggregate as applicable. Also any sublimits as maybe set forth in██████ ███████r renewal thereof. |





and the insurance afforded by this policy shall be excess insurance with respect to such Underlying Insurance and then only to the extent necessary so that the total limits of liability of the Company and the Insurers of such Underlying Insurance combined shall not exceed the limits of the Underwriters liability set forth in Insuring Agreement V.

16



It is further understood and agreed, however, that in the event the Insured suffers a loss which is covered under the above listed policies, the excess of which would be payable under this policy, except for terms and conditions of this policy which are not consistent with said policies, then notwithstanding anything contained in this policy to the contrary this policy shall be amended to follow and be subject to the terms and conditions of said policies in respect of such paid loss.

It is specifically understood and agreed that any exclusions, conditions or other provisions of the policies listed in (A) and (B) above, which have the effect of restricting or nullifying the coverage already granted by PART II of this Policy on a primary basis in the absence of such Underlying Insurance, shall not apply and this Policy will respond on a difference in conditions basis but only up to the Limits of Liability set forth in Insuring Agreement V.

VIII.   BAGGAGE AND PERSONAL EFFECTS DEDUCTIBLE

The Named Insured shall bear an amount equivalent to the limitations set forth in the tariff or rules and regulations incorporated into the contract of carriage, but in no event less than ▇▇▇▇ for each and every claim for Property Damage to Baggage and Personal Effects belonging to or in charge of any one person as the result of any one Occurrence.  In the event a prospective passenger does not make a flight referred to herein, the ▇▇▇▇ deductible aforementioned shall apply.  The foregoing deductible shall not apply with respect to such claims resulting from damage to the aircraft transporting such property of the passenger or claims arising out of fire, tornado, wind, cyclone, flood, explosion, earthquake or perils covered under Extended Coverage Endorsement (Aviation Liabilities) Endorsement Number 3.

The Company's obligation to pay damages on behalf of the Insured applies only to such damages in excess of the amount to be borne by the Named Insured as above provided.  The Company may pay any part or all of the amount to be borne by the Named Insured to effect settlement of any claim or suit and, upon notification of the action taken, the Named Insured shall promptly reimburse the Company for such part of the amount as has been paid by the Company.

## EXCLUSIONS - PART II

This insurance does not apply under this PART II;

(A)  to liability assumed by the Insured under any Contract or agreement, but this Exclusion (A) does not apply (1) to the Named Insured and to their directors, officers or employees while acting within their capacity as such or (2) to a warranty of fitness or quality of the Insured's products or a warranty that work performed by or on behalf of the Insured will be done in a workmanlike manner;

(B)  to any obligation for which the Insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation, or disability benefits law, or under any similar law;

(C)  except as provided under INSURING AGREEMENT VIII, Underlying Insurance, to Bodily Injury to any employee of the Insured arising out of and in the course of his employment by the Insured, to the extent that Underlying Insurance is provided by Part II Insuring Agreement VIII, Underlying Insurance; but this EXCLUSION (C) does not apply to liability assumed by the Insured under Contract;

(D)  to Property Damage to

(1)  property owned by the Insured, except such property which has been leased or conditionally sold or otherwise transferred to others under terms which transfer the risk of loss for such property to others, or

(2)  any aircraft leased or chartered to the Insured and for which the Insured, under Contract, has agreed to be responsible for physical loss or damage, and is insured under PART I of this policy, or

(3)  any Real Property or personal property other than aircraft or aircraft parts including engines which is not owned by the Insured and which is occupied by or used by or rented to or in the care, custody or control of the Insured or over which the Insured is for any purpose exercising physical control

(a)  due to and confined to gradual deterioration, moths, vermin and/or inherent vice, or

(b)  for the amount of loss actually recovered under any policy or policies of fire insurance or other property insurance arranged by the Insured or arranged by others, and which ultimately inures to the benefit of the Insured in satisfaction of all or part of the Insured's obligations to other persons having an interest in the said property, it being understood that the Insured will use his best endeavours to take out and maintain all property insurance which he is required to carry under the terms of any lease, license, rental agreement, pooling agreements, or mortgage relating to said property, but inadvertent failure to do so shall not prejudice this insurance,

but this EXCLUSION (D) shall not apply to liability assumed by the Insured under any Contract;

18



(E)  with respect to Passengers' Personal Effects;

    (1)  to injury, loss, destruction or delay due to or caused by fraudulent, wilful, or dishonest acts of the Named Insured's employees acting alone or in collusion with others;

    (2)  to loss caused by gradual deterioration, moth, vermin and/or inherent vice.

(F)  to Damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the Insured's products or work completed by the Insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use or subjected to a restricted use because of any known or suspected defect or deficiency therein;

(G)  to any claims directly or indirectly occasioned by, happening through or in consequence of;

    (1)  noise (whether audible to the human ear or not), vibration, sonic boom and any phenomena associated therewith,

    (2)  pollution and contamination of any kind whatsoever,

    (3)  electrical and electromagnetic interference,

    (4)  interference with the use of property;

unless caused by or resulting in a crash, fire, explosion or collision or a recorded in-flight emergency causing abnormal Aircraft operation.

    (a)  with respect to any provision in this policy concerning any duty of the Company to investigate or defend claims, such provision shall not apply and the Company shall not be required to defend

        (1)  claims excluded by this exclusion

        (2)  a claim or claims covered by this policy when combined with any claims excluded by this exclusion (referred to below as "Combined Claims").

    (b)  in respect of any Combined Claims, the Company shall (subject to proof of loss and the limits of liability of this policy) reimburse the Insured for that portion of the following items which may be allocated to the claims or claims covered by this policy;

        (1)  Damages awarded against the Insured and

        (2)  defence fees and expenses incurred by the Insured.

    (c)  nothing herein shall override any Radioactive Contamination or other exclusion clause attached to or forming part of this Policy.

Notwithstanding anything contained herein to the contrary this Exclusion (G) (i) does not apply with respect to Passengers or their baggage and personal effects, cargo and mail; (ii) (2) above does not apply to the legal liability of the Named Insured arising out of the pollution or contamination of any products supplied by them; (iii) shall be amended to conform to German statutory requirements as and when applicable.



(H) to Personal Injury arising out of the willful violation of a penal statute or ordinance committed by or with the knowledge and consent of the Insured; but with respect to the Named Insured this EXCLUSION (H) shall apply only if such violation is with the knowledge and consent of an officer or director of the Named Insured;

(I) except with respect to Coverage B, Group 5, to Personal Injury to any person arising out of or in connection with the hiring, firing, working conditions, employee benefits, or related practices of employment or policies of employment by the Named Insured;

(J) to claims for breach of fiduciary responsibilities, obligations or duties imposed upon the Insured by the Employee Retirement Income Security Act of 1974 (or amendments thereto) or any regulations as are promulgated thereunder, and any penalties, fines or taxes imposed in connection therewith;

(K) with respect to the Aircraft Hazard, to any aircraft to which the policy would otherwise apply, while such aircraft is leased to others and not operated by crews in the regular employ of the Named Insured, but in the event there shall be no other valid and collectible insurance available to the Named Insured while such aircraft is so leased, or in the event all other valid and collectible insurance shall not afford limits of liability equal to the limits of liability under this policy, the insurance afforded hereunder shall apply solely with respect to the interest of the Named Insured, and persons described in clause (e) of PART II - INSURING AGREEMENT IV - PERSONS INSURED and shall be excess of all other valid and collectible insurance available to the Named Insured;

(L) (1) This Policy does not cover:

    (i) loss of or destruction of or damage to any property whatsoever or any loss or expense whatsoever resulting or arising therefrom or any consequential loss

    (ii) any legal liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from:

        (a) the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof;

        (b) the radioactive properties of, or a combination of radioactive properties with toxic, explosive or other hazardous properties of, any other radioactive material in the course of carriage as cargo, including storage or handling incidental thereto;

        (c) ionizing radiations or contamination by radioactivity from, or the toxic, explosive or other hazardous properties of, any other radioactive source whatsoever.

  (2) It is understood and agreed that such radioactive material or other radioactive source in paragraph (1) (b) and (c) above shall not include:

    (i) depleted uranium and natural uranium in any form;

    (ii) radioisotopes which have reached the final stage of fabrication so as to be usable for any scientific, medical, agricultural, commercial, educational or industrial purpose.

20

 

(3)    This Policy, however, does not cover loss of or destruction of or damage to any property or any consequential loss or any legal liability of whatsoever nature with respect to which:

    (i)    the Insured under this Policy is also an Insured or an additional Insured under any other insurance policy, including any nuclear energy liability policy, or

    (ii)    any person or organization is required to maintain financial protection pursuant to legislation in any country; or

    (iii)    the Insured under this Policy is, or had this Policy not been issued would be, entitled to indemnification from any government or agency thereof.

(3)    Loss, destruction, damage, expense or legal liability in respect of the nuclear risks not excluded by reason of paragraph (2) shall (subject to all other terms, conditions, limitations, warranties and exclusions of this Policy) be covered, provided that:

    (i)    in the case of any claim in respect of radioactive material in the course of carriage as cargo, including storage or handling incidental thereto, such carriage shall in all respects have complied with the full International Civil Aviation Organization "Technical Instructions for the Safe Transport of Dangerous Goods by Air", unless the carriage shall have been subject to any more restrictive legislation, when it shall in all respects have complied with such legislation;

    (ii)    this policy shall only apply to an incident happening during the period of this Policy and where any claim by the Insured against the Insurers or by any claimant against the Insured arising out of such incident shall have been made within three years after the date thereof;

    (iii)    in the case of any claim for the loss of or destruction of or damage to or loss of use of an aircraft caused by or contributed to by radioactive contamination, the level of such contamination shall have exceeded the maximum permissible level set out in the following scale:

| Emitter<br><br>(IAEA Health and Safety Regulations) | Maximum permissible level of non-fixed radioactive surface contamination (Averaged over 300cm²) |
|---|---|
| Beta, gamma and low toxicity alpha emitters | Not exceeding 4 Bequerels/cm² ($10^{-4}$ microcuries/cm²) |
| All other emitters | Not exceeding 0.4 Bequerels/cm² ($10^{-5}$ microcuries/cm²) |

    (iv)    the cover afforded hereby may be cancelled at any time by the Insurers giving seven days' notice of cancellation.

(M)    to Personal Injury arising from American Airlines AAdvantage or similar programs, but this exclusion only applies to the actual benefit or cost thereof, which a Passenger claims is due under American Airlines AAdvantage or similar programs;

(N)    except as provided under INSURING AGREEMENT VII, Underlying Insurance, to Bodily Injury or Property Damage arising out of the ownership, maintenance, operation, use, loading or unloading of;

    (1)    any Automobile owned or operated by or rented or loaned to the Named Insured, or

    (2)    any other Automobile operated by any person in the course of his employment by the Named Insured,

but this EXCLUSION (N) does not apply to the parking of an Automobile on premises owned by, rented to, or controlled by the Named Insured or the way immediately adjoining, if such Automobile is not owned by or rented or loaned to the Named Insured;

(O)    except as provided under Insuring Agreement VII, UNDERLYING INSURANCE, to Bodily Injury or Property Damage arising out of and in the course of the transportation of Mobile Equipment by an Automobile owned or operated by or rented or loaned to the Named Insured;

## DEFINITIONS - PART II

For the purpose of this policy, the following terms shall be held to mean;

(a)  "Aircraft Hazard" means Bodily Injury or Property Damage arising out of the ownership, maintenance, use or operation of any aircraft;

(b)  "Aircraft Noise" means the noise of aircraft and the vibration associated therewith and also includes the phenomenon called "sonic boom";

(c)  "Air Transportation Business" means

    (1)  the ownership, maintenance, sale or use of aircraft,

    (2)  operations necessary or related to the providing of transportation of persons or property, travel agency and tour operations,

    (3)  operations, including maintenance and supply of goods or services, provided for or by others which are necessary or related to the providing of air transportation by the Insured or others,

    (4)  Company sponsored activities, events, promotions, award programs, teams and other events or happenings designed to further the air transportation business, image and good will of the Insured;

(d)  "Automobile" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include Mobile Equipment;

(e)  "Contract" means any contract or agreement, warranty of goods or products, expressed or implied;

(f)  "Bodily Injury" means bodily injury, sickness, disease, or mental anguish sustained by any person, including shock, fright, disability or death resulting therefrom or resulting from the apprehension thereof;

(g)  "Completed Operation Hazard" means Bodily Injury or Property Damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the Bodily Injury or Property Damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Named Insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times;

    (1)  when all operations to be performed by or on behalf of the Insured under the Contract have been completed,

    (2)  when all operations to be performed by or on behalf of the Insured at the site of the operations have been completed, or

    (3)  when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another Contractor or subcontractor engaged in performing operations for a principal as a part of the same project;

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed. The completed operations hazard does not include Bodily Injury or Property Damage arising out of

23

(a)  operations in connection with the transportation of property, unless the Bodily Injury or Property Damage arises out of a condition in or on a vehicle created by the loading or unloading thereof, or

(b)  the existence of tools, uninstalled equipment or abandoned or unused materials;

(h)  "Damages" (1) with respect to PART II; COVERAGE A. of INSURING AGREEMENT I, includes damages for care and loss of services resulting from Bodily Injury and for loss of use of property resulting from Property Damage, and (2) with respect to PART II, COVERAGE B. of INSURING AGREEMENT I., means only those damages which are payable because of Personal Injury arising out of an offence to which this insurance applies;

(i)  "Federal Aviation Administration" or "FAA" means the duly constituted authority of the United States having jurisdiction over civil aviation, or the equivalent authority of any nation

(j)  "In Flight" means the time commencing when the aircraft, other than a rotor craft or other vertical take-off and landing (VTOL) aircraft, moves forward in attempting to take off and continuing thereafter until it has completed its landing run.  A rotor craft or other VTOL aircraft shall be deemed to be in flight when any engine in the aircraft is being started or is operating or when the aircraft is off all supporting surfaces;

(k)  "Insured" means any person or organization qualifying as an Insured under INSURING AGREEMENT IV. PERSONS INSURED of PART II of this policy.  The insurance afforded applies separately to each Insured against whom claim is made or suit is brought, except with respect to the limit of the Company's liability;

(l)  "Mobile Equipment" means a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled, (1) not subject to motor vehicle registration, or (2) maintained for use principally on premises owned by or rented to the Named Insured, including the ways immediately adjoining, or (3) designed for use principally off public roads, or (4) subject to motor vehicle registration and operated on an airport premises, or (5) subject to motor vehicle registration and maintained for use exclusively on airport premises, or (6) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle; power cranes, shovels, loaders, diggers and drills; concrete mixers (other than the mix-in transit type); graders, scrapers, rollers and other road construction or repair equipment; air-compressors, pumps and generators, including spraying, welding and building cleaning equipment; and geophysical exploration and well servicing equipment;

(m)  "Named Insured's Insurance Department" means American Airlines, Inc.'s Insurance Department located at Corporate Headquarters, 4333 Amon Carter Blvd. Fort Worth, Texas 76155;

(n)  "Named Insured's Products" means goods or products manufactured, sold, handled or distributed by the Insured or by others trading under the name of the Insured, including any container thereof (other than a vehicle), but the Insured's products shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold;

(o)  "Occurrence" means an event or continuous or repeated exposure to conditions, which results, during the policy period, in Bodily Injury or Property Damage neither expected or intended from the standpoint of the Insured; however, Bodily Injury or Property Damage arising out of efforts to provide for the safety of persons, protection of property, preventing trespass or complying with regulations of any governmental authority shall be deemed an Occurrence;

24

(p)   "Passenger" means a person when entering the airport premises for the purpose of boarding the Named Insured's aircraft or while in, on, boarding or alighting from any other substitute conveyance arranged by the Named Insured for transportation to another airport and continues to be considered a passenger until alighting from the aircraft or such other substitute conveyance and leaves the airport premises. Persons transported to and from the airport by the Insured, internal airport transit, and while receiving services or overnight or other accommodation provided or arranged by the Insured or its agent shall be deemed passengers.

(q)   "Personal Injury" means injury arising out of one or more of the offences set forth in Part II. Insuring Agreement I.B.;

(r)   "Products Hazard" means Bodily Injury and Property Damage arising out of the Insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the Bodily Injury or Property Damage occurs away from the premises owned by or rented to the Insured and after physical possession of such product has been relinquished to others;

(s)   "Premises Hazard" means Bodily Injury or Property Damage arising out of occupation, rental or use of premises and all operations of the Insured at or away from premises which are necessary or incidental to the business of the Insured;

(t)   "Property Damage" means (1) injury to or destruction of tangible property including the loss of use thereof at any time resulting therefrom and (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an Occurrence;

(u)   "Real Property" means land and whatever is growing thereon, permanently affixed to or erected on it;

(v)   "Underlying Insurance" means insurance over which this policy is excess, as set forth in INSURING AGREEMENT VII of PART II of this policy.

25

## CONDITIONS - PART II

1.   **FINANCIAL RESPONSIBILITY LAWS**

When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle or aircraft financial responsibility laws, such insurance as is afforded by this policy for Bodily Injury liability or for Property Damage liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law. The Named Insured agrees to reimburse the Company for any payment made by the Company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

2.   **INSURED'S DUTIES IN THE EVENT OF OCCURRENCE, OFFENCE, CLAIM OR SUIT**

A.   In the event of an Occurrence or offence which appears likely to give rise to a claim under this policy, written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses shall be given by or for the Insured to the Company or any of their authorised agents within a reasonable period of time after such notice has been received by the Named Insured's Insurance Department; inadvertent failure to give such notice shall not invalidate this policy.

All expenses incurred by the Insured to prevent other Bodily Injury, Personal Injury or Property Damage arising out of the same or similar conditions shall not be recoverable under this policy unless agreed by the Company.

B.   If claim is made or suit is brought against the Insured, the Named Insured's Insurance Department shall immediately forward to the Company's every demand, notice, summons or other process upon receipt thereof.

C.   The Insured shall cooperate with the Company and, upon the Company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured because of Bodily Injury, Personal Injury or Property Damage with respect to which insurance is afforded under this policy, and, upon such request, the Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.   In connection with the Occurrence except as agreed elsewhere in print by Associated Aviation Underwriters, the Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than as expressly provided for under this Policy or for first aid to others at the time of the Occurrence.

3.   **CONFORMITY WITH REGULATIONS**

It is further agreed that terms of this policy which are in conflict or inconsistent with the statutes or regulations of any other domestic or foreign, federal, state or local jurisdiction where this policy is in effect are hereby amended to conform to such statutes or regulations.

## GENERAL CONDITIONS

1.  **PREMIUM**

    All premiums for this policy shall be as agreed between American Airlines and the Company elsewhere in writing.

    Payment of premium due under this policy shall be the obligation solely of the Named Insured.

2.  **INSPECTION OF PROPERTY INSURED AND AUDIT**

    The Company shall be permitted but not obligated to inspect the Named Insured's property and operations or to examine the log-books and insured aircraft at any reasonable time during the policy period and for a reasonable time thereafter. Neither the Company right to make inspection, nor the making thereof, nor any report thereon, shall constitute an undertaking on behalf of or for the benefit of the Named Insured or others to determine or warrant that such property or operations are safe.

    The Company may examine and audit the Named Insured's books and records at any reasonable time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

3.  **ACTION AGAINST THE COMPANY**

    A.  With respect to PART I, no suit or action on this policy for the recovery of any claim hereunder shall be sustainable in any court of Law or Equity unless the Named Insured shall have fully complied with all of the terms of this policy in respect of such claim, nor unless commenced within twenty four (24) months next after the happening of loss, provided that if written notice of claim has been given to the Company within such 24 month period the time for suit or action on this policy with respect to such claim or for recovery of the claim hereunder shall not expire until twelve months after the Company shall have given the Named Insured written notice of rejection or denial of all or any part of the claim, provided, however, that where such limitation of time is prohibited by the laws of the State wherein this Policy is issued then in that event no suit or action under this policy shall be sustainable unless commenced within a period greater than 24 months that is the shortest limitation permitted under such laws.

    B.  With respect to PART II, no action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy in respect of the claims that are the subject of such action, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgement against the Insured after actual trial or other judicial or arbitral proceeding or by written agreement of the Insured, the claimant and the Company.

    Any person or organization or the legal representative thereof who has secured such judgement or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Company as a party to any action against the Insured to determine the Insured's liability, nor shall the Company be impleaded by the Insured or its legal representative. Bankruptcy or insolvency or other similar proceeding involving the Insured or of the Insured's estate shall not relieve the Company of any of their obligations hereunder.

27

4.    ASSISTANCE AND CO-OPERATION OF THE INSURED

A.    With respect to PART I, in the event of loss or damage and whenever reasonably requested by the Company the Insured shall assist in the recovery of the property insured hereunder either by means of replevin proceedings or otherwise, in effecting settlement, securing evidence, obtaining the attendance or witnesses and prosecuting suits to such an extent and in such a manner as is deemed desirable by the Company and the Company shall reimburse the Insured for any expenses incurred at its request.

B.    With respect to PART II, the Insured shall cooperate with the Company in the conduct of suits and upon the Company's reasonable request, shall attend hearings and trials, shall assist in effecting settlements and securing and giving evidence and shall assist in obtaining the attendance of witnesses. The Company shall reimburse the Insured for any expenses incurred at the Company's request.   Except as agreed elsewhere in print by Associated Aviation Underwriters, the Insured shall not, except at the Insured's own cost, voluntarily make any payment, assume any obligation or incur any expense other than as expressly provided under this Policy or for such immediate medical and surgical relief to others as shall be imperative at the time of an Occurrence.

5.  CONTRACTUAL AGREEMENTS

A.    It is agreed that insofar as provision may be made under any Contracts or agreements entered into by the Named Insured which require the inclusion hereunder of Additional or Joint Insureds, Waivers of Subrogation, Hold Harmless and/or Indemnification Agreements, Cross Liability, Breach of Warranty and/or Loss Payable Clauses, Cancellation or Material Change Notices and/or any other insurance requirements which are in force at the commencement of this policy or entered into by the Named Insured during the currency of this policy, such coverage as is afforded under this policy shall automatically apply to such requirements.

B.    The Named Insured agrees to submit to the Company for inspection all Contracts entered into subsequent to the inception of this policy for inspection and, if required, additional premium, where the Company's right of subrogation is prejudiced or the Named Insured assumes liability of others for Bodily Injury, Property Damage, or Personal Injury, except those Contracts which American Airlines Inc.'s Insurance Department considers usual or customary in the business of the Named Insured.   The inadvertent failure of the Named Insured to submit any such Contracts shall not invalidate the coverage afforded by this policy.

C.    It being specifically understood and agreed that nothing contained in this General Condition shall be construed to extend the coverage of this Policy in respect of perils not otherwise covered hereunder, and the inclusion of all such Agreements as provided for in Paragraph A. above shall be subject to the terms, conditions, exclusions and limits of liability set forth herein.

D.    Where required, Certificates of Insurance, evidencing the terms of this insurance are to be issued by either Aon Risk Services of Texas Inc. or Aon Group Limited, Aviation and notwithstanding anything contained herein to the contrary, such Certificates and their insurance provisions are hereby incorporated by reference and made a part hereof as if attached hereto.

28

6.  SUBROGATION

A.  With respect to PART I, upon the payment of any loss, damage or expense by the Company they shall be subrogated to the rights of the Named Insured in respect thereto and the Named Insured's right or recovery against any party for such loss or damage is hereby assigned to the Company to the extent that payment therefor is made by the Company.

The Named Insured has the right, prior to loss, to enter Contracts and agreements limiting or waiving its rights to recover from others for loss of or damage to the aircraft or other property, or naming other as Insureds and as Loss Payees. The Named Insured shall do nothing after a loss to prejudice the Company's rights.

B.  With respect to PART II:

(1)  When this policy applies as primary coverage, in the event of any payment hereunder, the Company shall be subrogated to all the Insured's rights of recovery therefor against any person or organization and, at the reasonable request of Company (and at their expense as provided in Part II, INSURING AGREEMENT III SUPPLEMENTARY PAYMENTS), the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights, but the Company agrees that it will not exercise any such right of subrogation against the Insured nor against any person or organization in respect of which the Insured has assumed liability under Contract.

(2)  When this policy applies as excess coverage, the Insured's rights of recovery against any person or other entity cannot be exclusively subrogated to the Company. It is, therefore, understood and agreed that in case of any payment hereunder, the Company will act in concert with all other interests (including the Insured) concerned, in the exercise of such rights of recovery. The apportioning of any amounts which may be so recovered shall follow the principle that any interests (including the Insured) that shall have paid an amount over and above any payment hereunder, shall first be reimbursed up to the amount paid by them; the Company are then to be reimbursed out of any balance then remaining up to the amount paid hereunder; lastly, the interests (including the Insured) of whom this coverage is in excess are entitled to claim the residue, if any. Expense necessary to the recovery of any such amounts shall be apportioned between the interests (including the Insured) concerned, in the ratio of their respective recoveries as finally settled.

7.  SETTLEMENT WITHOUT COMPANY'S CONSENT

Except as agreed elsewhere in print by the Company, the Company shall not be liable for any loss, damage or expense, which, without their consent, has been settled or compromised with others except as permitted in GENERAL CONDITION 5.

 

8.  CANCELLATION

It is understood and agreed that this policy is non-cancelable by either the Insured or the Company, unless agreed elsewhere in writing.

NOTWITHSTANDING anything in this Policy to the contrary, it is hereby understood and agreed that in the event of the premium not having been paid by the Insured at the inception of the risk or in case of installments, on the due date, the Company are hereby authorized by the Insured to cancel this Policy at the Company's discretion. Such cancellation may be effected by the Company giving forty-five days' notice to the Insured by registered letter, cable or telex addressed to Aon Risk Services of Texas Inc. of intent to cancel. Such cancellation shall take effect at 12.01 A.M. Central Standard Time on the 45th day from the date that such notice was dispatched by the Company. If such non payment of premium is rectified within any notice period, notice of cancellation is automatically withdrawn and the Policy remains in full force and effect.

9.  ASSIGNMENT

Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon. If, however, the Named Insured shall be adjudged bankrupt or insolvent within the policy period, this policy, unless cancelled, shall, if written notice be given to the Company within sixty (60) days after the date of such adjudication, cover the Named Insured's legal representative as the Named Insured.

10.  CHANGES

Except as provided elsewhere in this Policy, notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or change in any part of this policy or estop the Company from asserting any right under the terms of this policy, nor shall the terms of this policy be waived or changed except by endorsement issued to form a part of this policy, or by written agreement approved by the Company. Changes of a restrictive nature shall not be effective unless and until specifically accepted in writing by American Airlines, Inc.

11.  OTHER INSURANCE

A.  With respect to PART I, if there be other insurance arranged by the Named Insured against loss or damage covered by this policy the Company shall not be liable for a larger proportion of the entire loss than the amount hereby insured bears to the total amount of the Named Insured's valid and collectible insurance. In the event the Insured shall purchase total loss only or excess hull coverages, the Insured agrees to notify the Company within 30 days thereafter, but failure to so notify shall not invalidate the policy.

B.  With respect to PART II, except as otherwise agreed in this policy, if there is other valid and collectible insurance available to the Insured with respect to loss covered by this policy, the insurance afforded by this policy shall be excess insurance only with respect to such other valid and collectible insurance other than insurance arranged by the Named Insured in excess of this insurance. In no event, however, will this provision be construed with respect to any Insured under subparagraph (c) of INSURING AGREEMENT IV - PERSONS INSURED or any person or organization in respect of which the Insured has assumed liability under Contract under General Condition 5 - CONTRACTUAL AGREEMENTS so as to place the Named Insured in breach of its Contracts to furnish insurance for such Insured, person or organization.

30



12. **VIOLATION OF PROVISIONS**

In the event of the violation by the Named Insured of any provision of this policy (except agreements to pay premiums) which results in the voidance of the coverage provided under this policy, such voidance shall affect only the aircraft directly affected by such violation and as to all other aircraft the insurance hereunder shall remain in full force and effect.

13. **NOTIFICATION REQUIREMENTS**

Inadvertent failure of the Named Insured to comply with any notifications or reporting provisions under this policy shall not invalidate the coverage provided hereunder.

14. **CHOICE OF LAW**

All disputes arising under this policy, including without limitation any disputes involving the coverage available hereunder, shall be governed exclusively by the law of the State of Delaware, without regard to its conflict of law or choice of venue rules. The Insured and the Company consent to the exclusive jurisdiction of the courts of Delaware for any and all such disputes.

The Insured and the Company acknowledge that this provision forms a material part of the policy and that money Damages would not be sufficient to remedy any breach of this provision. In addition to all other remedies otherwise available, specific performance, injunctive relief, or other equitable relief shall be available to remedy any breach of this provision.

15. **DECLARATIONS**

By acceptance of this policy, the Named Insured agrees that the statements in the DECLARATIONS are its agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between itself and the Company or any of their agents relating to this insurance.

 

WAR, HI-JACKING AND OTHER PERILS EXCLUSION CLAUSE (AVIATION) AVN.48B

This Policy does not cover claims caused by:

(a) War, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power.

(b) Any hostile detonation of any weapon of war employing atomic or nuclear fission and/or other like reaction or radioactive force or matter.

(c) Strikes, riots, civil commotions or labour disturbances.

(d) Any act of one or more persons, whether or not agents of a sovereign Power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional.

(e) Any malicious act or act of sabotage.

(f) Confiscation, nationalization seizure, restraint, detention, appropriation, requisition for title or use by or under the order of any Government (whether civil military or de facto) or public or local authority.

(g) Hi-jacking or any unlawful seizure or wrongful exercise of control of the Aircraft or crew in flight (including any attempt at such seizure or control) made by any person or persons on board the Aircraft acting without the consent of the Insured.

Furthermore this Policy does not cover claims arising whilst the Aircraft is outside the control of the Insured by reason of any of the above perils. The Aircraft shall be deemed to have been restored to the control of the Insured on the safe return of the Aircraft to the Insured at an airfield not excluded by the geographical limits of this Policy, and entirely suitable for the operation of the Aircraft (such safe return shall require that the Aircraft be parked with engines shut down and under no duress).

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 Policy Number SP-6505 of the Company

Issued to: American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY: _____

Endorsement Number 1

## EXTENDED COVERAGE ENDORSEMENT (AIRCRAFT HULLS) AVN.51 (AMENDED)

It is understood and agreed that with respect to PART I, Physical Damage, in the event of the cancellation or automatic termination of the Insured's Hull War and Other Perils Insurance ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ this Policy, subject prior advice to the Company and terms to be agreed, will be extended to cover claims caused by the following risks:

(i)    Strikes, riots, civil commotions or labour disturbances;

(ii)   Any malicious act or act of sabotage.

(iii)  Hi-jacking or any unlawful seizure or wrongful exercise of control of the aircraft or crew in flight (including any attempt at such seizure or control) made by any person or persons on board the aircraft acting without the consent of the Insured.

PROVIDED ALWAYS THAT:

1.    The above extension shall only apply to the extent that the loss or damage is not otherwise excluded by (a), (b), (d) and (f) of the War, Hi-jacking and Other Perils Exclusion Clause (Aviation) AVN.48B.

2.    The limits of the Company's liability in respect of any or all of the risks covered under this extension shall not exceed the sum of ▮▮▮▮▮▮▮▮ (in the aggregate during the policy period).

3.    The Insured is not required to bear any deductible under this extension.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:      _____

Endorsement Number 2



### EXTENDED COVERAGE ENDORSEMENT (AVIATION LIABILITIES) AVN.52C (AMENDED)

It is further understood and agreed that with respect to PART II, Comprehensive Airline Liability, paragraphs (a) and (c) to (g) of the War, Hi-jacking and Other Perils Exclusion Clause (AVN.48B) are deleted as follows:

1.  WHEREAS the Policy of which this Endorsement forms part includes the War, Hi-Jacking and Other Perils Exclusion Clause (Aviation) AVN.48B, IN CONSIDERATION of an Additional Premium included herein, it is hereby understood and agreed that with effect from inception, all sub-paragraphs other than (b) of Clause AVN.48B forming part of this Policy are deleted SUBJECT TO all terms and conditions of this Endorsement.

2.  AUTOMATIC TERMINATION

    To the extent provided below, cover extended by this Endorsement shall TERMINATE AUTOMATICALLY in the following circumstances:

    (i)   All cover
          upon the outbreak of war (whether there be a declaration of war or not) between any two or more of the following States, namely, France, the People's Republic of China, the Russian Federation, the United Kingdom, the United States of America.

    (ii)  Any cover extended in respect of the deletion of sub-paragraph (a) of Clause AVN.48B

          upon the hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter wheresoever or whensoever such detonation may occur and whether or not the Insured Aircraft may be involved

    (iii) All cover in respect of any of the Insured Aircraft requisitioned for either title or use

          upon such requisition

For purposes of this Policy, any use or requisition of the insured aircraft for CRAF operations are covered hereunder notwithstanding sub-paragraph 2 (iii) above.

PROVIDED THAT if an Insured Aircraft is in the air when (i), (ii) or (iii) occurs, then the cover provided by this Endorsement (unless otherwise cancelled, terminated or suspended) shall continue in respect of such an Aircraft until completion of its first landing thereafter and any passengers have disembarked.

Endorsement Number 3
Page 1 of 2

3.     CANCELLATION

    (a)   Limited Cancellation (48 hours)

        Following a hostile detonation as specified in 2.(ii) above, the Company may give notice of cancellation of one or more parts of the cover provided by paragraph 1. of this Endorsement by reference to sub-paragraphs (c), (d), (e), (f) and/or (g) of Clause AVN.48B - such notice to become effective on the expiry of forty-eight hours from 23.59 hours GMT on the day on which notice is given.

    (b)   Cancellation (7 days)

        The cover provided by this Endorsement may be cancelled by either Company or the Insured giving notice to become effective on the expiry of seven days from 23.59 hours GMT on the day on which such notice is given.

    (c)   Notices

        All notices referred to herein shall be in writing.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to: American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:     _____

                              Endorsement Number 3
                              Page 2 of 2

CANADIAN TRANSPORTATION AGENCY
AIR TRANSPORTATION REGULATIONS:
PRESCRIBED LIABILITY INSURANCE COVERAGE - SECTION 7
(HEREINAFTER CALLED "SECTION 7")
AIRCRAFT ACCIDENT LIABILITY INSURANCE

IT IS UNDERSTOOD AND AGREED THAT:

1. The Policy to which this endorsement is attached is hereby amended to provide coverage in compliance with the provisions of Section 7.

2. Such coverage shall be within the limits of liability in the Policy and not in addition to or in excess thereof.

3. Unless the Policy otherwise provides and to the extent permitted by the provisions of Section 7, the following exclusions shall apply:-

   (i)   War Exclusions Clause AVN48B paragraphs (a) and (b) or equivalent clause(s).

   (ii)  Noise and Pollution and Other Perils Exclusion Clause AVN46B or equivalent clause(s).

   (iii) Nuclear Risks Exclusion Clause AVN38B or equivalent clause(s).

   (iv)  Bodily injury to or sickness disease or death of any employee arising out of and in the course of his/her employment.

   (v)   Injury to or destruction of property owned rented leased or loaned to or occupied or used by the Insured.

4. If Insurers are called upon to provide coverage to the Insured in compliance with Section 7 including the defence and legal costs associated therewith and if by reason of the terms conditions limitations and exclusions of the Policy such coverage would not have been provided except for this endorsement then the Insured will reimburse Insurers for such payments made in providing coverage under Section 7.

5. The terms conditions limitations and exclusions of the Policy shall apply to claims made under the Policy which (a) are in excess of the limits specified in Section 7 or (b) are not governed by the provisions of Section 7.

AVN57C (Canada)  1.10.96

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:          _____
                      Endorsement Number 4



**D.O.T. 14 CFR PART 205**
**(HEREINAFTER CALLED "PART 205")**
**AIRCRAFT ACCIDENT LIABILITY INSURANCE**

IT IS UNDERSTOOD AND AGREED THAT:

1. The policy to which this endorsement is attached is hereby amended to provide coverage in compliance with the provisions of Part 205.

2. Such coverage shall be within the limits of liability in the Policy and not in addition to or in excess thereof.

3. Such coverage shall continue until cancelled by Insurers or their authorized representative giving the appropriate notice.

4. Unless the Policy otherwise provides the following exclusions not prohibited by the provisions of Part 205 shall apply:

   (i) War Exclusions Clause AVN48B paragraphs (a) and (b) or equivalent clause(s).

   (ii) Noise and Pollution and Other Perils Exclusion Clause AVN46B or equivalent clause(s).

   (iii) Nuclear Risks Exclusion Clause AVN38B or equivalent clause(s).

   (iv) Bodily injury to or sickness disease or death of any employee arising out of and in the course of his/her employment.

   (v) Injury to or destruction of property owned rented leased or loaned to or occupied or used by the Insured.

5. If Insurers are called upon to provide coverage to the Insured in compliance with Part 205 including the defence and legal costs associated therewith and if by reason of the terms conditions limitations and exclusions of the Policy such coverage would not have been provided except for this endorsement then the Insured will reimburse Insurers for such payments made in providing coverage under Part 205.

6. The terms conditions limitations and exclusions of the Policy shall apply to claims made under the Policy which (a) are in excess of the limits specified in Part 205 or (b) are not governed by the provisions of Part 205.

AVN57A (USA)  1.10.96.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY: _____

Endorsement Number 5

## DENIED BOARDING/OVERBOOKING

It is agreed that in the event of denied boarding or removal of a Passenger because of withholding, oversale or overbooking of space available, the Named Insured shall bear the amount required to be tendered as compensation for such, denied boarding or removal in accordance with the Named Insured's tariffs and applicable Government Regulations.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:     _____

Endorsement Number 6



## GERMAN PERSONAL ACCIDENT INSURANCE

It is hereby agreed that to enable the Insured to comply with LUFT VG paragraph 50 and LUFT VZO paragraph 96 (German Air Law) this insurance is extended to include Automatic Personal Accident Insurance coverage of ████████ per Passenger for death or injury (limited to disablement benefits as prescribed by German Insurance Law) in respect of those Passengers who board the Insured's aircraft within the territorial limits of The Bundesrepublic Deutschland, such Personal Accident Insurance commencing from embarkation on the aircraft and terminating upon disembarkation therefrom.

The Personal Accident Insurance to be paid by the Insured to the person or persons legally entitled subject to a receipt acknowledging that such Personal Accident Insurance will be taken into account in any legal liability claim in accordance with LUFT VG paragraph 50 and LUFT VZO paragraph 95.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY: _____

Endorsement Number 7



## 50/50 PROVISIONAL CLAIMS SETTLEMENT CLAUSE

WHEREAS the Insured has in full force and effect

A)   a "Hull All Risks" policy which inter alia contains the War Hijacking and Other Perils Exclusion Clause (AVN.48B) and

B)   a "Hull War Risks" policy which inter alia covers certain of the risks excluded by AVN.48B in (A) above

NOW IT IS HEREBY UNDERSTOOD AND AGREED THAT:

in the event of loss of or damage to an Aircraft covered hereunder and where agreement is reached between the "Hull All Risks" Underwriters and the "Hull War Risks" Underwriters that the Insured has a valid claim under one or other policy where nevertheless it cannot be resolved within 21 days from the date of Occurrence as to which policy is liable, each of the aforementioned groups of Insurers agree, WITHOUT PREJUDICE to their liability, to advance to the Insured 50% of the amount that would have been paid under the policy but for the dispute between Insurers until such time as final settlement of the claim is agreed.

PROVIDED ALWAYS THAT:

(i)    the "Hull All Risks" and "Hull War Risks" placing slips are identically endorsed with this provisional claims settlement clause

(ii)   within 12 months of the advance being made all Underwriters specified in (i) above agree to refer the matter to arbitration in London in accordance with the Statutory provision for arbitration for the time being in force

(iii)  once the arbitration decision has been conveyed to the parties concerned, the "Hull All Risks" Underwriters or the "Hull War Risks" Underwriters as the case may be shall repay the amount advanced by the other group of Insurers together with interest for the period concerned which is to be calculated using the London Clearing Banks' Base Rate.

(iv)   if the "Hull All Risks" and "Hull War Risks" policies contain differing "amounts payable", the advance will not exceed the lesser of the amounts involved. In the event of Co-insurance or risks involving uninsured proportion(s), the appropriate adjustment will be made. For the purposes of this paragraph (iv) "amounts payable" shall be defined to mean the Agreed Value of the Aircraft as defined in the Policy, calculated without reference to any deductible or self-insured retention.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:          _____

Endorsement Number 8

# AIR MOBILITY COMMAND

It is agreed, that, with respect only to operations of the Named Insured performed under Contract with the Air Mobility Command, Department of the Air Force (USAF), and with respect only to Aircraft Liability Insurance afforded under this policy, the following conditions shall also apply:

(a) The Underwriter agrees that, the insurance afforded under this policy shall not be subject to any lower limits of liability of the Warsaw Convention, 49 Stat. 3000, for the death or Bodily Injury of any Passenger. If that convention should otherwise be deemed to be applicable to any Passenger death or Bodily Injury liability, then to the extent stated in the preceding sentence, this insurance shall be deemed to be a higher limit of liability agreed to by special Contract as contemplated by the last sentence of Article 22(1) of that convention.

(b) The exclusions of the policy are deleted and the following substituted therefore:

The insurance afforded under this policy shall not apply to:

(1) Any loss against which the Named Insured has other valid and collectible insurance, except that the limits of liability provided under this policy shall be excess of the limits provided by such other valid and collectible insurance but in no event exceeding the limits of liability expressed elsewhere in this policy.

(2) Any loss arising from the ownership, maintenance or use of any type of aircraft not declared to the Underwriter in accordance with the terms and conditions of this policy.

(3) Liability assumed by the Insured under any Contract or agreement except as stated in this Contract with respect to limitations of the Warsaw Convention.

(4) Bodily Injury, sickness, disease, mental anguish or death of any employee of the Insured while engaged in the duties of his employment, or any obligation for which the Insured or any company as his Underwriter may be held liable under any Workman's Compensation or occupational disease law.

(5) Damage to or destruction of property owned, rented, occupied, or used by, or in the care, custody or control of the Insured, or carried in or on any aircraft with respect to which the insurance afforded by this policy applies.

(6) Personal injuries or death or damage to or destruction of property, caused directly or indirectly, by hostile or warlike actions, including action in hindering, combating or defending against an actual, impending or expected attack by any Government or sovereign power, de jure or de facto, or military, naval or air forces; the discharge, explosion, or use of any weapon of war employing atomic fission, or atomic fusion, or radioactive materials, insurrection, rebellion, revolution, civil war or usurped power, including any action in hindering, combating or defending against such an Occurrence, or confiscation by any Government or public authority.

Endorsement Number 9
Page 1 of 2



(c)  The Company hereby waives any right of subrogation it may have against the United States of America, by reason of any payment under the aforesaid policy of insurance, with respect to loss caused to transportation services by acts of the United States of America or any agency thereof which acts are in conjunction with the performance by the Named Insured of any services under said Contract.

(d)  In the event the Company elects to cancel the insurance afforded under this policy, the Underwriter hereby agrees that such cancellation shall not be effective unless written notice thereof shall be sent by the Underwriter by registered mail not less than 30 days in advance of such cancellation, direct to the Air Mobility Command, United States Air Force, 402 Scott Dr., Unit 3A1, Scott Air Force Base, Illinois, Attention: XOKAI, and in the event the Named Insured requests such cancellation, the Company agrees to notify, by registered mail, the above stated activity immediately upon receipt of such request.

(e)  Anything in the policy to the contrary notwithstanding, the aircraft may be operated by pilots authorized by the Named Insured.

(f)  Violations of regulations prescribed by the Federal Aviation Administration (FAA) shall not prejudice the insurance afforded by this policy.

(g)  No special waiver issued by the FAA shall affect the insurance afforded hereunder.

(h)  Any exclusions, conditions or other provisions of this endorsement, which have the effect of restricting or nullifying the coverage already granted by this policy in the absence of this endorsement, shall not apply.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:  _____

Endorsement Number 9
Page 2 of 2

## GROUNDING LIABILITY COVERAGE

It is agreed that the following Insuring Agreement is added under PART II, Comprehensive Airline Liability:

1. Loss of Use - Grounding Liability Coverage -

   The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as Damages for the loss of use of completed aircraft occurring after delivery to, and acceptance by, a purchaser or operator of such aircraft for revenue producing flight operations and caused by the grounding of two or more such aircraft arising out of the existence or alleged or suspected existence of a like defect, fault or condition in a part or parts thereof sold, handled or distributed by the Named Insured or manufactured, assembled or processed by any other person or organization according to specifications, plans, orders or drawings of the Named Insured or with tools, machinery or other equipment furnished to such person or organisation by the Named Insured.

2. With respect to the insurance afforded under Paragraph 1. of this endorsement -

   (a) This insurance does not apply:

      (1) to loss of use of any aircraft caused by failure of the Named Insured, after grounding, to exercise diligence and dispatch and to use all reasonable means to correct and eliminate without cost to the Company, the cause of the loss of use;

      (2) to loss of use of any aircraft caused by the wilful failure of the Named Insured to perform any contractual obligation with respect to making available or delivering to the buyer spare parts, tools, manuals, instructions, blueprints or engineering data;

      (3) to costs incurred for the correction or elimination of the cause of the loss of use;

      (4) to loss of use of any military aircraft used by or on behalf of the Armed Services of the United States Government or of any foreign government;

      (5) to loss of use of any aircraft resulting from routine maintenance or minor alteration of the aircraft;

      (6) to loss of use of any aircraft occurring during the period that facilities normally available to the Insured for the correction and elimination of the cause of the loss of use cannot be made available to the Insured;

      (7) to any aircraft after it is designated by the prime manufacturer, or required by direction of the F.A.A., C.A.A. or any similar Civil Airworthiness Authority to be removed from all flight operations due to its certificate of air worthiness being withdrawn by reason of the aircraft's safe operational life having been reached or exceeded.

Endorsement Number 10
Page 1 of 2



(b) The Company's limit of liability for all Damages on account of all groundings during the policy period shall not exceed ▮▮▮▮▮▮ as part of and not in addition to the Limits of Liability set forth under Insuring Agreement V(B)(3) of Part II.

(c) "Grounding" means the complete and continuous cessation, at the directive of the F.A.A. and/or the original manufacturer for any period of time and in the interest of safety, of all revenue producing flight operations of aircraft.

A Grounding shall be deemed to commence from the date of the Occurrence which gave rise to such order and continue until the last such order relating to the same existing, alleged or suspected like defect, fault or condition is withdrawn or becomes ineffective.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:    _____
                        Endorsement Number 10
                        Page 2 of 2

## AIR TRANSPORTATION BUSINESS

It is agreed that all operating entities of AMR Corporation, American Airlines Inc. and all their subsidiary, affiliated, managed, owned or controlled companies existing at inception of this insurance and not objected to by the Company are deemed to fall within the policy definition of "Air Transportation Business" and as such are covered hereunder on a primary basis, except as otherwise stated herein, but subject otherwise to all terms, conditions, and limitations of this policy. The Named Insured's Insurance Department agrees to advise the Company of any newly formed or acquired operations which are materially different from those operations existing at inception of the policy which the Company had agreed fall within the definition of Air Transportation Business. The Named Insured agrees to pay any Additional Premium as may reasonably be required with respect to such newly formed or acquired operations. The Company may terminate the insurance afforded hereunder with respect to any such newly formed or acquired subsidiary by notifying the Named Insured at the address as stated in the Declarations, stating when not less than thirty (30) days thereafter such insurance shall terminate. Such termination shall not affect any other insurance afforded hereunder.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:     _____

Endorsement Number 11




ENDORSEMENT APPLICABLE ONLY TO PART II
PASSENGER INTERRUPTED FLIGHT COVERAGE

1.  If the flight of an aircraft insured under this Policy is interrupted by;

    (a)  a forced landing on land or water (even though such forced landing may have resulted in no injuries to Passengers), or

    (b)  the grounding of the aircraft because of a mechanical failure or a suspected mechanical failure or accidental damage to the aircraft and in respect of which damage a valid and collectible claim can be made (or could be made, save only for the application of any deductible provision) under PART I of this Policy,

    The Company agrees to pay on behalf of the Named Insured all sums which the Insured shall become legally obligated to pay by reason of the liability imposed upon the Insured by law or assumed by the Insured under Contract or agreement, for the necessary additional costs of transporting each Passenger or prospective Passenger from the point of such interruption to the final destination as indicated on the transportation ticket sold to the Passenger by the Insured or their representative.

    The provisions of this extension apply only to persons who were Passengers in the aircraft at the time of the forced landing or grounding of the aircraft.

2.  It is agreed that the Insured shall bear the first █████ of each loss in respect of wide-bodied aircraft and █████ of each loss in respect of other aircraft so covered under this Endorsement and then shall only recover ███ of their ultimate net loss for each Occurrence.

3.  For the purpose of adjusting any claim under this Endorsement the calculation of the Insured's ultimate net loss shall be calculated as follows:

    Take the sub-charter cost                          _____

    Less the Insured's standard flight cost            _____

    Add    (i)   the Insured's direct costs            _____

           (ii)  any delay costs                       _____

    = the cost of such interrupted flight              _____

4.  This coverage is subject to an annual aggregate of ███████

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to: American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:    _____
                        Endorsement Number 12

 

## CONTINGENT COVERAGE

It is agreed that PARTS I and II of this policy shall apply in respect of aircraft leased or sold to others (hereinafter referred to as "operators") in which the Named Insured retains a financial interest.

PART I shall indemnify the Named Insured for physical loss or damage to such aircraft to the extent that the Named Insured is not made whole excess of Policy deductibles, by the operators or Physical Damage Insurance carried by the operators by reason of:

(i)   the failure of the operators to carry such Physical Damage Insurance in full or in part as may be required by the Named Insured of the operator, or

(ii)  the failure or lack of obligation (other than by reason of insolvency) of the Insurers of such Physical Damage Insurance to pay for such claims.

PART II shall indemnify the Named Insured in the event that Bodily Injury/Personal Injury/Property Damage (including Passengers) Liability claims against the Named Insured are not reimbursed to or satisfied on behalf of the Named Insured either by operators or by the Liability Insurance Policies carried by the operators by reason of;

(i)    the failure of the operators to carry such Liability Insurance in full or in part as may be required by the Named Insured of the operator,

(ii)   the failure or lack of obligation (other than by reason of insolvency) of the Insurers of such Liability Insurance to pay for such claims, or

(iii)  the exhaustion of available limit under such Liability Insurance.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:        _____
                       Endorsement Number 13

 

SPARES COVERAGE

It is agreed that:

1.    **COVERAGE**

PART I, Physical Damage, of this policy shall apply on an excess basis for all risks of physical loss or damage except as hereinafter provided to the following described property including while in transit.

2.    **PROPERTY INSURED**

Aircraft Spare parts and engines (hereinafter referred to as spares) usually attached to and forming a part of an aircraft, but while not so attached and provided such spares are owned by the Named Insured or the property of others while in the care, custody or control of the Named Insured and for which the Named Insured has agreed, in the writing, to be responsible for direct physical damage.

3.    **EXCLUSIONS**

Subject otherwise to the Exclusions under PART I, Physical Damage, the Coverage afforded under paragraph 1. of this endorsement shall not apply to;

(i)    such spares temporarily removed from the aircraft which are to be reinstalled therein,

(ii)    cabin service equipment, such as but not limited to, comestibles, flatware, plates, cups, blankets, pillows, etc.,

(iii)    such spares carried in the aircraft as a spare part kit,

(iv)    mysterious disappearance or unexplained loss or shortage discovered upon taking of inventory,

(v)    loss due to conversion by a person in lawful possession of the Aircraft Spare Parts or by any person whose possession would be lawful but for such conversion,

(vi)    loss due to infidelity or any dishonest act on the part of the Insured or their employees,

(vii)    loss or damage to any property which may be sustained while under any process and directly resulting therefrom.

Endorsement Number 14
Page 1 of 2

4.  **LIMITS OF LIABILITY**

The Company's Limit of Liability shall be as follows:

(a)  ▉▉▉▉▉ each Occurrence / transit within the USA and ▉▉▉▉ only.

(b)  ▉▉▉▉▉ each Occurrence / transit outside the USA and ▉▉▉ including transit to or from the USA and ▉▉▉ but only as respects spare engines, parts and accessories.

Excess of Policy Numbers as on file with ▉▉▉▉▉▉▉▉▉▉▉▉▉

5.  **LOSS ADJUSTMENTS**

For purposes of adjusting losses it is agreed that:

A.  The value of all leased or mortgaged Property Insured under paragraph 2. of this endorsement shall not be less than the value required under the applicable financing documents at the time of loss.

B.  The value of all other Property Insured under paragraph 2. of this endorsement, other than leased or mortgaged property, shall be the replacement cost.

Provided always that in no event shall the amount due with respect to any loss covered hereunder exceed the limits of liability set forth under paragraph 4. of this Endorsement

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:  _____

Endorsement Number 14
Page 2 of 2

 

## BUYER FURNISHED EQUIPMENT

It is hereby understood and agreed that the coverage provided by this policy is extended to include buyer furnished equipment prior to and after being installed in new and/or additional aircraft before such aircraft are accepted by the Insured, subject to a maximum sum insured of ███████ any one aircraft/any one location, whilst at Insured's risk prior to deliver only.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY: _____
                               Endorsement Number 15

 

**CIVIL AVIATION (CARRIERS' LIABILITY) ACT 1959 - AUSTRALIA**
(Applicable to Passenger Liability only)

IT IS UNDERSTOOD AND AGREED THAT:

1.  The Policy to which this endorsement is attached is hereby amended to provide coverage in compliance with the prescribed requirements referred to in Part IVA subsection 41C(2) of the Civil Aviation (Carriers' Liability) Act 1959.

2.  Such coverage shall be within the limits of liability in the Policy and not in addition to or in excess thereof.

3.  Such coverage shall continue until cancelled by Insurers or their authorised representative giving the appropriate notice.

4.  Unless the Policy otherwise provides the following exclusions not prohibited by the provisions of the said Act shall apply:

    4.1. War Exclusion Clause AVN48B paragraphs (a) and (b) or equivalent clause(s).

    4.2. Noise and Pollution and Other Perils Clause AVN46B or equivalent clause(s).

    4.3. Aviation Radioactive Contamination Exclusion Clause AVN38A or equivalent clause(s).

    4.4. Bodily Injury to or sickness, disease or death of any employee arising out of and in the course of his/her employment.

5.  The coverage for personal injury as required by the said Act to be provided by the Policy to which this endorsement is attached shall be understood to mean bodily injury, sickness, disease, fright, shock or mental anguish including death resulting therefrom.

6.  If Insurers are called upon to provide coverage to the Insured in compliance with the said Act including the defence and legal costs associated therewith and if by reason of the terms, conditions, limitations and exclusions of the Policy such coverage would not have been provided except for this endorsement then the Insured will reimburse Insurers for such payments made in providing coverage under the said Act.

7.  The terms, conditions, limitations and exclusions of the Policy shall apply to claims made under the Policy which (a) are in excess of the limits specified in the said Act or (b) are not governed by the provisions of the said Act.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to: American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY: _____
                              Endorsement Number 16



**SWITZERLAND**
**AIR NAVIGATION ACT 21st DECEMBER 1948**
**AIR NAVIGATION DECREE 14th NOVEMBER 1973**
**(HEREINAFTER CALLED "THE ACTS")**
**AIRCRAFT THIRD PARTY LEGAL LIABILITY**

IT IS UNDERSTOOD AND AGREED THAT:

1) This Policy to which this endorsement is attached is hereby amended to provide cover as required by the regulations of the acts in respect of bodily injury or property damage caused to third parties on the ground up to the limits specified therein.

2) Such coverage shall be within the limits of liability in the policy and not in addition to or in excess thereof.

3) Unless the policy otherwise provides the following exclusions apply:

   (i) War, Hi-jacking and Other Perils Exclusion Clause AVN.48B paragraphs (a) and (b) or equivalent clause(s).

   (ii) Noise and Pollution and Other Perils Exclusion Clause AVN.46B, or equivalent clause(s).

   (iii) Aviation Radioactive Contamination Exclusion Clause AVN.38A or equivalent clause(s).

   (iv) Bodily injury to or sickness disease or death of any employee arising out of and in the course of his/her employment.

   (v) Injury to or destruction of property owned rented leased or loaned to or occupied or used by the Assured.

4) If Insurers are called upon to provide coverage to the Assured in compliance with the said Air Navigation Act or Air Navigation Decree including the defence and legal costs associated therewith and if by reason of the terms, conditions, limitations and exclusions of the Policy such coverage would not have been provided except for the provisions of this endorsement then the Assured will reimburse the Insurers for such payments made in providing such coverage.

5) The terms, conditions, limitations and exclusions of the Policy shall continue to apply to claims made under the Policy which (a) are in excess of the limits specified above or (b) are not governed by the said Air Navigation Act or Air Navigation Decree.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to: American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY: _____

Endorsement Number 17

 

## ELECTRONIC DATE RECOGNITION EXCLUSION

This policy does not cover any claim, damage, injury, loss, cost, expense or liability of any nature whatsoever arising from, occasioned by or in consequence of (whether directly or indirectly and whether wholly or partly):

A.  the failure or inability to correctly recognize, process, distinguish, interpret or accept any change of year, date or time, including but not limited to:

    (1)  the change of year from 1999 to 2000; or

    (2)  the change of date from August 21, 1999 to August 22, 1999;

    by any computer system, hardware, program or software, microprocessor, integrated circuit or similar device, whether in computer equipment or non-computer equipment, whether the property of any Insured or of others; or

B.  any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by any Insured or for any Insured or by any third party to determine, rectify or test for any potential or actual problems described in paragraph A. above.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-8505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:        _____

                         Endorsement Number 18

 

ELECTRONIC DATE RECOGNITION EXCLUSION
LIMITED COVERAGE ENDORSEMENT

In consideration of the premium charged and to the extent such coverage is afforded by the policy, the Electronic Date Recognition Exclusion shall not apply to:

A.    any of the Physical Damage coverages provided by the policy; or

B.    any sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage caused by an occurrence.

Notwithstanding paragraph B above, this Endorsement shall not apply to:

(1)    any coverage for loss of use caused by an occurrence during the policy period arising out of subparagraph A. or B. of the Electronic Date Recognition Exclusion unless such loss of use also arises out of additional injury in the form of physical injury to or destruction of tangible property; or

(2)    any coverage for grounding; or

(3)    any coverage applying in excess of any scheduled underlying insurance.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:    _____
                            Endorsement Number 19

 

**EXCESS LIABILITY**
**SPECIAL PROVISIONS ENDORSEMENT**

It is agreed that, notwithstanding anything to the contrary contained in Insuring Agreements-Part II, VII UNDERLYING INSURANCE (Applicable to PART II), the ELECTRONIC DATE RECOGNITION EXCLUSION attached to and made part of this policy shall apply to the insurance afforded by this policy that is excess of any scheduled underlying insurance.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:                    _____
                            Endorsement Number 20

 

## IN-FLIGHT HANGARKEEPER'S LIABILITY COVERAGE

It is agreed that:

1.  Solely with respect to Property Damage to an aircraft of others while such aircraft is in Flight  in connection with third party maintenance performed by the Named Insured and in the care, custody or control of the Named Insured's crew, a deductible shall apply to each and every occurrence in the same amounts as set forth in INSURING AGREEMENTS PART I, III - AIRCRAFT HULL DEDUCTIBLES.

2.  The Company may pay any part or all of "DEDUCTIBLE" to effect settlement of any claim or suit, and, upon notification of the action taken, the Named Insured shall promptly reimburse the Company therefore.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:          _____
                         Endorsement Number 21

 

## MISCELLANEOUS ENDORSEMENT

It is agreed that:

1.    Item (e) of A. of VII. UNDERLYING INSURANCE on page 15 of the policy is amended to read as follows:

 (e)

███████ any one occurrence and ███████ in the aggregate as applicable (other than Products and Completed Operations).

███████ any one occurrence and in the aggregate as applicable as respects Products and Completed Operations.

2.    Item (b) and (c) of B. of VII. UNDERLYING INSURANCE on page 16 are deleted.

3.    Item VIII.    BAGGAGE AND PERSONAL EFFECTS DEDUCTIBLE on page 17 is amended to read as follows:

The Named Insured shall bear an amount equivalent to the limitations set forth in the tariff or rules and regulations incorporated into the contract of carriage, but in no event less than █████. for each and every claim for Property Damage to Baggage and Personal Effects belonging to or in charge of any one person as the result of any one Occurrence. In the event a prospective passenger does not make a flight referred to herein, the █████ deductible aforementioned shall apply. The foregoing deductible shall not apply with respect to such claims resulting from damage to the aircraft transporting such property of the passenger or claims arising out of fire, tornado, wind, cyclone, flood, explosion, earthquake or perils covered under Extended Coverage Endorsement (Aviation Liabilities) Endorsement Number 3.

The Company's obligation to pay damages on behalf of the Insured applies only to such damages in excess of the amount to be borne by the Named Insured as above provided. The Company may pay any part or all of the amount to be borne by the Named Insured to effect settlement of any claim or suit and, upon notification of the action taken, the Named Insured shall promptly reimburse the Company for such part of the amount as has been paid by the Company.

This endorsement is effective: December 1, 2000

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to: American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:

Endorsement Number 22

 

### AMENDATORY ENDORSEMENT

It is agreed that Endorsements Number 2 EXTENDED COVERGE ENDORSEMENT (AIRCRAFT HULLS) AVN.51 and Endorsement No. 3 EXTENDED COVERAGE ENDORSEMENT (AVIATION LIABILITIES) AVN.52C are hereby deleted in their entirety.

This endorsement is effective:  September 26, 2001

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY: _____  2/28/2002

Endorsement Number 23

 

**EXTENDED COVERAGE ENDORSEMENT (AVIATION LIABILITIES)**

1.  WHEREAS the Policy of which this Endorsement forms part includes the War, Hi-Jacking and Other Perils Exclusion Clause, Endorsement Number 1, IN CONSIDERATION of an Additional Premium as agreed, it is hereby understood and agreed that with effect from September 26, 2001, all sub-paragraphs other than (b) of Endorsement Number 1 forming part of this Policy are deleted SUBJECT TO all terms and conditions of this Endorsement.

2.  EXCLUSION applicable only to any cover extended in respect of the deletion of sub-paragraph (a) of Endorsement Number 1.

    Cover shall not include liability for damage to any form of property on the ground situated outside Canada and the United States of America unless caused by or arising out of the use of aircraft.

3.  LIMITATION OF LIABILITY

    The limit of Insurers' liability in respect of the coverage provided by this Endorsement shall be ████████████ or the applicable policy limit whichever the lesser any one Occurrence and in the annual aggregate (the "sub-limit"). This sub-limit shall apply within the full Policy limit and not in addition thereto.

    To the extent coverage is afforded to an Insured under the Policy, this sub-limit shall not apply to such Insured's liability:

    (a)  to the passengers (and for their baggage and personal effects) of any aircraft operator to whom the Policy affords cover for liability to its passengers arising out of its operation of aircraft;

    (b)  for cargo and mail while it is on board the aircraft of any aircraft operator to whom the Policy affords cover for liability for such cargo and mail arising out of its operation of aircraft.

4.  AUTOMATIC TERMINATION

    To the extent provided below, cover extended by this Endorsement shall TERMINATE AUTOMATICALLY in the following circumstances:

(i)  All cover
    - upon the outbreak of war (whether there be a declaration of war or not) between any two or more of the following States, namely, France, the People's Republic of China, the Russian Federation, the United Kingdom, the United States of America

(ii)  Any cover extended in respect of the deletion of sub-paragraph (a) of Endorsement Number 1
    - upon the hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter wheresoever or whensoever such detonation may occur and whether or not the Insured Aircraft may be involved

(iii)  All cover in respect of any of the Insured Aircraft requisitioned for either title or use
    - upon such requisition

    PROVIDED THAT if an Insured Aircraft is in the air when (i), (ii) or (iii) occurs, then the cover provided by this Endorsement (unless otherwise cancelled, terminated or suspended) shall continue in respect of such an Aircraft until completion of its first landing thereafter and any passengers have disembarked.

Endorsement Number 24
Page 1 of 2

 

5.    **REVIEW AND CANCELLATION**

(a)    Review of Premium and/or Geographical Limits (7 days)
Insurers may give notice to review premium and/or geographical limits - such notice to become effective on the expiry of seven days from 23.59 hours GMT on the day on which notice is given.

(b)    Limited Cancellation (48 hours)
Following a hostile detonation as specified in 4 (ii) above, Insurers may give notice of cancellation of one or more parts of the cover provided by paragraph 1 of this Endorsement by reference to sub-paragraphs (c), (d), (e), (f) and/ or (g) of Clause AVN 48B - such notice to become effective on the expiry of forty-eight hours from 23.59 hours GMT on the day on which notice is given.

(c)    Cancellation (7 days)
The cover provided by this Endorsement may be cancelled by either Insurers or the Insured giving notice to become effective on the expiry of seven days from 23.59 hours GMT on the day on which such notice is given.

(d)    Notices
All notices referred to herein shall be in writing.

This endorsement is effective:  September 26, 2001

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Attached to and forming part of AIRLINE INSURANCE FORM AMR-2000 of Policy Number SP-6505 of the Company

Issued to:  American Airlines, Inc.

APPROVED: ASSOCIATED AVIATION UNDERWRITERS

BY:                                          3/28/2003
                              Endorsement Number 24
                              Page 2 of 2



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                              :
IN RE SEPTEMBER 11, 2001 LITIGATION    :        21 MC 97 (AKH)
                                              :
                                              :
-------------------------------------------------------------x

## PLAINTIFFS' THIRD AMENDED FLIGHT 77 MASTER LIABILITY COMPLAINT

### (THE PENTAGON CRASH)

Plaintiffs, by their respective attorneys complaining of the defendants herein, upon information and belief, respectfully state as and for their common liability allegations as follows:

### BACKGROUND

These actions seek damages on behalf of plaintiffs, the heirs and next of kin of decedents, and the Estates of decedents for the wrongful deaths of the individuals who were killed in the hijacking and crash of American Airlines Flight 77 (hereinafter "Flight 77") into the Pentagon in Arlington, Virginia on September 11, 2001 as well as on behalf of those who were in the Pentagon or in the vicinity thereof who were killed or injured as a result of the Flight 77 crash and its aftermath.   Flight 77 originated at Dulles International Airport, Virginia (hereinafter "Dulles Airport") and was bound for Los Angeles International Airport.

In sum, these actions allege that for several years prior to September 11, 2001, AMERICAN, THE OTHER AIRLINE DEFENDANTS and THE SECURITY COMPANY DEFENDANTS named herein, BOEING, and the METROPOLITAN WASHINGTON AIRPORTS AUTHORITY had actual knowledge of the fact that terrorist groups and individuals associated with them had publicly proclaimed a pathological hatred of the United States, its

1

citizens and those who resided or traveled within or to its borders and vowed to kill Americans and to destroy American institutions and that airlines and airports were a likely target of their violence. The risk of harm to airline passengers and persons on the ground or in buildings who might suffer injury or death as a result of improper or unauthorized operation of an aircraft was heightened by the fact that these defendants had knowledge of dangerous long-standing flaws in airline and airport security, that commercial passenger aircraft were demonstrated to be vulnerable to attacks by persons intent upon causing death and injury in furtherance of their ideologies, and yet the defendants failed to take reasonable action to protect passengers and others from harm in light of that knowledge and the risk presented. These defendants also knew or should have recognized what numerous evaluations disclosed; namely, that the airline and airport security systems and those who implemented, operated and maintained them routinely failed to detect dangerous and deadly weapons capable of causing injury and death passing through so-called security checkpoints. These defendants are jointly and severally liable for the wrongful deaths, injuries and damages resulting from the September 11 attacks because they were negligent, careless, wanton and reckless in failing to develop, implement, and maintain adequate airline and airport security systems at Dulles Airport, failed to implement reasonable and effective security measures prior to September 11, 2001 to deter and to prevent hijackers from carrying dangerous and deadly weapons aboard Flight 77 capable of causing injury and death, and failed to take the necessary measures to protect and secure the cockpit of Flight 77 from intrusion by terrorists who sought to gain control of the aircraft and cause it to crash.

Defendant BOEING, which designed and manufactured the hijacked aircraft, was equally aware of the terrorist risks to civil aviation. Boeing knew that its aircraft were possible terrorist

2

targets and had been the subject of numerous previous incidents of passengers breaching security aboard its aircraft. Moreover, Boeing knew that its 757/767 aircraft lacked numerous security features that would and could have prevented or deterred the terrorists from targeting Boeing's planes, taking unfettered control of the aircraft, and crashing them into buildings.

Where appropriate, individuals (or the Personal Representative in the death cases) who were occupants of the Pentagon or were in the immediate vicinity on and subsequent to September 11, 2001 are referred to collectively as "the Pentagon Plaintiffs."

## JURISDICTION AND VENUE

1.       This Court has subject matter jurisdiction over all defendants pursuant to the "Air Transportation Safety And Systems Stabilization Act," Pub.L. 107-42, 115 Stat. 230 (the "Act"), Sections 408(b)(1) and (3), which establishes that "[t]he United States District Court for the Southern District of New York shall have original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001."[1]

2.       Jurisdiction with respect to AMERICAN with respect to some plaintiffs whose individual actions are brought on account of the deaths of passengers engaged in international transportation is also founded on 28 U.S.C. §1331 and the Convention for the Unification of Certain Rules Relating to International Transportation by Air, 49 Stat. 3000 (hereinafter "Warsaw Convention").

---

[1]       Some actions are also based upon diversity jurisdiction, 28 U.S.C. §1332, in that there is complete diversity of citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

3.      Jurisdiction is also based upon supplemental jurisdiction, pursuant to 28 U.S.C. Section 1367, with respect to any claims forming part of the same case or controversy.

## THE PARTIES

4.      On September 11, 2001, each Flight 77 decedent was a fare-paying passenger aboard Flight 77.

5.      The Pentagon Plaintiffs or their decedents were occupants of the Pentagon or were in the vicinity of the structure on September 11, 2001 when Flight 77 crashed into it or thereafter while the risk of injury or death was still present.

## AMERICAN AIRLINES

6.      Defendant AMR CORPORATION (hereinafter "AMR") is a corporation organized and existing under the laws of Delaware and maintains its principal place of business in Texas.

7.      Defendant AMR is engaged in the business of air transportation of passengers for hire.

8.      Defendant AMERICAN AIRLINES, INC. is a corporation organized and existing under the laws of Delaware and maintains its principal place of business in Texas.

9.      Defendant AMERICAN AIRLINES, INC. is a common carrier engaged in the business of transporting passengers by air and operates regularly scheduled flights from Dulles Airport and is responsible for the airline and airport security system at Dulles Airport.

10.      Defendant AMR is the parent corporation of and exercised control over its wholly-owned subsidiary, defendant AMERICAN AIRLINES, INC.

4

11.     Defendant AMR, as the parent corporation of its wholly-owned subsidiary AMERICAN, is liable for the negligent, reckless and wanton acts of AMERICAN AIRLINES, INC.  (AMR and AMERICAN AIRLINES, INC. are referred to collectively hereinafter as "AMERICAN").

12.     On September 11, 2001, AMERICAN operated a Boeing 757-200 aircraft, registration no. N644AA ("the subject aircraft"), designated as Flight 77 which departed from Dulles International Airport, Virginia (hereinafter "Dulles Airport") with an intended destination of Los Angeles International Airport.

## OTHER AIRLINE DEFENDANTS

13.     Defendant AIRTRAN AIRWAYS, INC. (hereinafter "AIRTRAN") is a corporation duly organized and existing under the laws of Delaware and maintains its principal place of business in Florida.  At all times pertinent to the Complaint, AIRTRAN was a common carrier engaged in the business of transporting passengers by air and operated regularly scheduled flights from Dulles Airport. AIRTRAN was jointly, severally and contractually liable by and through its agents, employees and contractors for maintaining the airline and airport security system at Dulles Airport.

14.     Defendant ATLANTIC COAST AIRLINES, INC. (hereinafter "ACA") is a corporation duly organized and existing under the laws of California and maintains its principal place of business in Virginia.  At all times pertinent to the Complaint, ACA was a common carrier engaged in the business of transporting passengers by air and operated regularly scheduled flights from Dulles Airport.  ACA was jointly, severally and contractually liable by and through

its agents, employees and contractors for maintaining the airline and airport security system at Dulles Airport.

15.    Defendant CONTINENTAL AIRLINES, INC. (hereinafter "CONTINENTAL") is a corporation duly organized and existing under the laws of Delaware and maintains its principal place of business in Texas.  At all times pertinent to the Complaint, CONTINENTAL was a common carrier engaged in the business of transporting passengers by air and operated regularly scheduled flights from Dulles Airport.  CONTINENTAL was jointly, severally and contractually liable by and through its agents, employees and contractors for maintaining the airline and airport security system at Dulles Airport.

16.    Defendant DELTA AIR LINES, INC. (hereinafter "DELTA") is a corporation duly organized and existing under the laws of Delaware and maintains its principal place of business in Georgia.  At all times pertinent to the Complaint, DELTA was a common carrier engaged in the business of transporting passengers by air and operated regularly scheduled flights from Dulles Airport.  DELTA was jointly, severally and contractually liable by and through its agents, employees and contractors for maintaining the airline and airport security system at Dulles Airport.

17.    Defendant NATIONAL AIRLINES, INC. (hereinafter "NATIONAL") is a corporation duly organized and existing under the laws of Delaware and maintains its principal place of business in Nevada.  At all times pertinent to the Complaint, NATIONAL was a common carrier engaged in the business of transporting passengers by air and operated regularly scheduled flights from Dulles Airport.  NATIONAL was jointly, severally and contractually

6

liable by and through its agents, employees and contractors for maintaining the airline and airport security system at Dulles Airport.

18.    Defendant NORTHWEST AIRLINES CORPORATION (hereinafter "NORTHWEST") is a corporation duly organized and existing under the laws of Delaware and maintains its principal place of business in Minnesota. At all times pertinent to the Complaint, NORTHWEST was a common carrier engaged in the business of transporting passengers by air and operated regularly scheduled flights from Dulles Airport. NORTHWEST was jointly, severally and contractually liable by and through its agents, employees and contractors for maintaining the airline and airport security system at Dulles Airport.

19.    Defendant UNITED AIR LINES, INC. (hereinafter "UNITED") is a corporation duly organized and existing under the laws of Delaware and maintains its principal place of business in Texas. At all times pertinent to the Complaint, UNITED was a common carrier engaged in the business of transporting passengers by air and operated regularly scheduled flights from Dulles Airport. UNITED was jointly, severally and contractually liable by and through its agents, employees and contractors for maintaining the airline and airport security system at Dulles Airport.

20.    Defendant U.S. AIRWAYS, INC. (hereinafter "U.S. AIRWAYS") is a corporation duly organized and existing under the laws of Delaware and maintains its principal place of business in Virginia. At all times pertinent to the Complaint, U.S. AIRWAYS was a common carrier engaged in the business of transporting passengers by air and operated regularly scheduled flights from Dulles Airport. U.S. AIRWAYS was jointly, severally and contractually

liable by and through its agents, employees and contractors for maintaining the airline and airport security system at Dulles Airport.

21.    Defendants AIRTRAN, ATLANTIC COAST, CONTINENTAL, DELTA, NATIONAL, NORTHWEST, UNITED and U.S. AIRWAYS are collectively referred to hereinafter as "THE OTHER AIRLINE DEFENDANTS."

## THE SECURITY COMPANY DEFENDANTS

22.    Defendant ARGENBRIGHT SECURITY, INC.(hereinafter "ARGENBRIGHT") is a corporation organized and existing under the laws of Georgia and maintains its principal place of business in Georgia.

23.    Defendant SECURICOR PLC hereinafter (hereinafter "SECURICOR") is a foreign corporation organized and existing under the laws of the United Kingdom.

24.    Defendant SECURICOR is the parent corporation of and exercised control over its wholly-owned subsidiary, defendant ARGENBRIGHT.

25.    Defendant SECURICOR, as the parent corporation of its wholly-owned subsidiary ARGENBRIGHT, is liable for the negligent, reckless and wanton acts of ARGENBRIGHT.

26.    ARGENBRIGHT and SECURICOR (hereinafter "THE SECURITY COMPANY DEFENDANTS") were corporations engaged in the business of, and separately and collectively assumed responsibility for, implementing, developing, owning, operating, managing, maintaining and supervising airline and airport security for AMERICAN for their flights departing from Dulles Airport, including Flight 77.

8

## MWAA

27.    Defendant METROPOLITAN WASHINGTON AIRPORTS AUTHORITY (hereinafter "MWAA") is a corporation organized and existing under the laws of Virginia and the District of Columbia and maintains its principal place of business in Virginia.

28.    On and prior to September 11, 2001, MWAA owned, operated, controlled, managed and maintained Dulles Airport and was responsible for airline and airport security for all flights departing from Dulles Airport.

## THE BOEING DEFENDANT

29.    Defendant THE BOEING COMPANY (hereinafter "BOEING" was and is a corporation duly organized and existing under the laws of Delaware and maintains its principal place of business in Washington.

30.    Defendant BOEING is engaged in the business of designing and manufacturing aircraft to be used to transport passengers by common carriers such as United and others throughout the world.

31.    Defendant BOEING designed and manufactured the subject aircraft and their component parts and systems.

## GENERAL ALLEGATIONS

32.    On and prior to September 11, 2001, AMERICAN, by its officers, agents, employees, servants or representatives operated, controlled and supervised the airline and airport security system at the subject airport and the ticketing check-in and boarding processes, including identification and document checks for the subject aircraft and flight.

9

33.    On September 11, 2001, AMERICAN, by its officers, agents, employees, servants or representatives owed the highest duty of care to safeguard its airplanes and passengers to prevent hijackers from breaching the airline and airport security system and carrying dangerous weapons aboard the subject aircraft to threaten its safety and those aboard it; ensure the subject aircraft was safe and secure from unreasonable dangers; and, operate the subject aircraft so as not to cause injury or death.

34.    On and prior to September 11, 2001, defendant MWAA, by its officers, agents, employees, servants or representatives operated, controlled and supervised the airline and airport security system at the subject airport, including passenger screening, security checkpoint operations, and controlling access to secure areas of the airport.

35.    On September 11, 2001, defendant MWAA, by its officers, agents, employees, servants or representatives owed a duty of care to safeguard the subject aircraft and passengers to prevent hijackers or others from breaching the airline and airport security system and carrying dangerous weapons aboard the subject aircraft to threaten its safety and those aboard it.

36.    On and prior to September 11, 2001, THE OTHER AIRLINE DEFENDANTS, by their officers, agents, employees, servants or representatives operated, controlled, supervised and maintained the airline and airport security system at the subject airport, including but not limited to passenger screening and security checkpoint operations.

37.    On September 11, 2001, THE OTHER AIRLINE DEFENDANTS, by their officers, agents, employees, servants or representatives owed a duty of care to safeguard the subject aircraft and passengers to prevent hijackers or others from breaching the airline and

10

airport security system and carrying dangerous weapons aboard the subject aircraft to threaten its safety and those aboard it.

38.     On and prior to September 11, 2001, THE SECURITY COMPANY DEFENDANTS were corporations engaged in the business of owning, operating, managing, maintaining and supervising airline and airport security for various airlines at numerous airports, including defendant AMERICAN for its flights departing from Dulles International Airport and for the subject flight.

39.     On and prior to September 11, 2001, THE SECURITY COMPANY DEFENDANTS, by their respective officers, agents, employees, servants and/or representatives were required and undertook to select, hire, train, instruct, and supervise the security checkpoint screeners, metal detector and x-ray machine monitors and others who operated, maintained and controlled the subject airport's security checkpoints for defendant AMERICAN'S flights, including the subject flight, regarding passenger screening, ticket and identification documents detection, confiscation of dangerous weapons, passenger risk evaluations and other security measures to prevent hijackers from boarding the subject aircraft.

40.     On and prior to September 11, 2001, THE SECURITY COMPANY DEFENDANTS, by their respective officers, agents, servants, employees and/or representatives developed, operated, maintained, controlled and supervised the airline and airport security for defendant AMERICAN'S flights, including the subject flight.

41.     On September 11, 2001, THE SECURITY COMPANY DEFENDANTS, by their respective officers, agents, employees, servants or representatives owed a duty of care to safeguard the subject aircraft and its passengers and to prevent hijackers from breaching the

11

airline and airport security system and carrying dangerous objects aboard the subject aircraft to threaten its safety and those aboard it.

42.     Prior to September 11, 2001, the Department of Transportation through its Federal Aviation Administration licensed AMERICAN and THE OTHER AIRLINE DEFENDANTS as commercial air carriers authorized to transport passengers for hire, pursuant to which AMERICAN and THE OTHER AIRLINE DEFENDANTS had an obligation to comply with all federal statutes, rules, regulations, and environmental directives to achieve the highest level of airline and airport security to ensure that passengers and persons on the ground or in buildings who might suffer injury or death as a result of improper or unauthorized operation of an aircraft were protected from harm as a result of a terrorist action.

43.     On and prior to September 11, 2001, AMERICAN, THE OTHER AIRLINE DEFENDANTS, MWAA, and THE SECURITY COMPANY DEFENDANTS, through their agents, servants, officers, employees, designees and/or contractors jointly and severally undertook and were required to develop, implement, own, operate, manage, supervise, staff, equip, maintain, control and/or oversee the airline and airport security system at Dulles Airport (including, but not limited to passenger screening, security checkpoint operations, pre-boarding passenger and luggage inspections, controlling access to secure areas and other security activities, ticketing purchase and check-in procedures and passenger identification and document checks for the subject aircraft and flight), to ensure the safety of persons traveling in air transportation and persons on the ground and in buildings who might suffer death or injury as a result of improper or unauthorized operation of an aircraft by persons engaged in acts of criminal violence, air piracy or terrorist activity.

12

44.    Prior to September 11, 2001, AMERICAN, THE OTHER AIRLINE DEFENDANTS and MWAA entered into contractual relationships with THE SECURITY COMPANY DEFENDANTS to provide security screening services at Dulles Airport.

45.    On and prior to September 11, 2001, AMERICAN, THE OTHER AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS and MWAA, by their respective officers, agents, employees, servants and/or representatives, separately and collectively, selected, hired, trained, instructed and supervised the security checkpoint screeners, metal detector and x-ray machine monitors and others who operated, maintained and controlled the security checkpoints at Dulles Airport.

46.    Prior to September 11, 2001, regular meetings were held among AMERICAN, THE OTHER AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS and MWAA during which airport security was discussed, and details about terrorist threats and potential security breaches were reviewed and discussed.

47.    On and prior to September 11, 2001, all defendants, their agents, associates, and partners, and each of them, were the agent, servant, employee, assignee, successor in interest, or joint venturer of each other and were acting within the purpose or scope of such agency or employment; and all acts or omissions alleged herein of each defendant were authorized, adopted, approved, or ratified by each of the other defendants.

48.    All defendants, and each of them, were fully informed of the actions of their agents and employees, and no officer, director, or managing agent of defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions and then all defendants, and each of them, thereby ratified those actions.

13

49.    Prior to September 11, 2001, AMERICAN, THE OTHER AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS and MWAA knew of the grave risk of attacks upon civil aviation generally, and commercial aircraft and airports.  The Department of Transportation Inspector General, Federal Aviation Administration, Government Accounting Office and other independent and industry auditors repeatedly published information concerning terrorist threats to civil aviation.  For example, in its 1999 annual report, *Criminal Acts Against Civil Aviation* (hereinafter "The 1999 Report"), the FAA's Office of Civil Aviation Security advised of potential dangers, including the identification of Osama Bin Laden as a specific threat to hijack an airliner and target the United States:

> "Another threat to civil aviation is from Saudi terrorist financier Usama Bin Ladin....In a May, 1998 interview, Bin Ladin implied that he could use a shoulder-fired surface-to-air missile to shoot down a military passenger aircraft transporting U.S. military personnel.  He reiterated that his attacks would not distinguish between U.S. civilians and military personnel.  Moreover, an exiled Islamic leader in the United Kingdom proclaimed in August 1998 that Bin Ladin would 'bring down an airliner, or hijack an airliner to humiliate the United States.'"

The 1999 Report at 59.

The report also points to the 1994 Ramzi Yousef conspiracy to place explosive devices on as many as 12 U.S. airliners flying out of the Far East as further evidence of the desire and intent to attack U.S. commercial aircraft.  Id.

In addition, threats that aircraft would be used as missiles and crashed into American institutions were passed on to the FAA and AMERICAN, THE OTHER AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS and MWAA and other commercial carriers:

> In January, 1995, a Philippine National Police raid turned up materials in a Manila apartment indicating that three individuals - Ramzi Yousef, Abdul Murad

14

and Khalid Shaykh Mohammed - planned, among other things, to crash an airplane into CIA headquarters....Information on the threat was passed to the FAA, which briefed U.S. and major foreign carriers.

Joint Inquiry Staff Statement, Part I, Eleanor Hill, Staff Director, Joint Inquiry Staff, September 18, 2002, at p.26.

In the 1999 Report, the FAA issued the following warning:

"There is every reason to believe that civil aviation will continue to be an attractive target for terrorist groups.... Increased awareness and vigilance are necessary to deter future incidents be they from terrorists like Ramzi Yousef or non-terrorists bent on suicide, as occurred in Brazil in 1997. It is important to do the utmost to prevent such acts rather than to lower security measures by interpreting the statistics [which showed a decrease in incidents between 1993 and 1998] as an indication of a decreased threat."

The 1999 Report at p. 59-60.

50.     Prior to September 11, 2001, the defendants knew or should have known about documented and reported numerous security breaches involving unauthorized access to secure areas (including ramps and aircraft) and warnings that security was at risk and that passenger and carry-on baggage screening system was vulnerable; those reports detailed dangerous, long-standing flaws and deficiencies in airport security and warned the defendants that their airline and airport security systems were unsafe and needed significant improvements in staffing, training and equipment in order to ensure the safety of persons traveling in air transportation and persons on the ground or in buildings who might suffer injury or death as a result of improper or unauthorized operation of an aircraft by persons engaged in acts of criminal violence, hijacking, terrorist activity, and air piracy.

51.     On and prior to September 11, 2001, AMERICAN, THE OTHER AIRLINE DEFENDANTS, and MWAA knew or should have known that evaluations of the airline and airport security systems as they existed on September 11, 2001 revealed that said systems

15

constituted a grave security risk; that THE SECURITY COMPANY DEFENDANTS provided

screening services which were inadequate and that such inadequacies posed severe dangers to its

passengers and the public; that THE SECURITY COMPANY DEFENDANTS failed to

adequately train its employees, hired illegal aliens, failed to conduct required criminal

background checks, and routinely failed in undercover security evaluations.

52.    On September 11, 2001, five hijackers passed through the airline and airport

security system at Dulles Airport, boarded Flight 77 and carried or obtained dangerous weapons

capable of causing injury or death.

53.    On September 11, 2001 at approximately 8:20 a.m., Flight 77 departed Dulles

Airport with 58 passengers and 6 crew members.

54.    At some time after take-off and upon information and belief, five terrorists on

board hijacked and commandeered the subject aircraft with the aid of dangerous and deadly

weapons capable of causing injury or death, including, but not limited to, box cutters, knives,

razors and/or disability gas.

55.    Upon information and belief, certain passengers were injured or killed during the

hijacking.

56.    Upon information and belief, the five individuals who hijacked Flight 77 have

been identified as Khalid Al-Midhar, Majed Moqed, Nawaq Alhamzi, Salem Alhamzi, and Hani

Hanjour (collectively referred to as the "hijackers") and were associated with or members of the

Al Qaeda terror network led by Osama Bin Laden.

57.    At approximately 9:40 a.m., after the hijackers gained control, the subject aircraft crashed into the Pentagon killing all persons on board the subject aircraft and injuring and killing persons within or in the immediate vicinity of the Pentagon.

58.    As a result of the actions of the hijackers, the passengers of Flight 77 were subjected to unusual G-forces, causing physical personal injuries, as well as pre-death pain and suffering, extreme emotional distress, extreme terror, and unremitting fear of impending death based on the knowledge that the hijackers had killed or attempted to kill passengers or crew aboard Flight 77 and that other aircraft had been hijacked and crashed into the World Trade Center, and damage to their personal property.

59.    As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

## COUNT ONE

### CLAIMS FOR PERSONAL INJURIES, WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST AMERICAN, THE SECURITY COMPANY DEFENDANTS AND MWAA, BASED ON NEGLIGENCE, NEGLIGENCE PER SE, RECKLESS CONDUCT AND CONSCIOUS DISREGARD FOR RIGHTS AND SAFETY

60.     Plaintiffs incorporate by reference all prior allegations in this Complaint.

61.     On and prior to September 11, 2001, AMERICAN, THE SECURITY

COMPANY DEFENDANTS and MWAA, by their officers, agents, employees, servants or

representatives, had an independent, joint and several, non-delegable duty to exercise and

provide the passengers of Flight 77 as well as persons on the ground or in buildings who might

suffer death or injury as a result of improper or unauthorized operation of an aircraft with the

highest level of security and care to safeguard Flight 77 and all other aircraft that operated at

Dulles Airport to prevent hijackers from carrying dangerous and deadly weapons capable of

causing injury or death aboard aircraft or otherwise threaten the safety of passengers and crew or

those on the ground.

62.     The defendants were jointly and severally required to secure Flight 77 from

unreasonable dangers such as terrorist action aboard the aircraft, including hijacking, and to

operate the subject aircraft in a manner which would not result in injury or death to its passengers

or others on the ground.

63.     On and prior to September 11, 2001, AMERICAN and MWAA entered into

contracts with THE SECURITY COMPANY DEFENDANTS for security services for all flights

departing from Dulles Airport. These defendants had a duty to exercise the highest degree of

care for the safety and security of all passengers passing through security checkpoints at Dulles

18

Airport and prior to boarding aircraft there, and in recognition of that duty, voluntarily entered

into contracts with THE SECURITY COMPANY DEFENDANTS to provide various airline and

airport security services so as to secure from harm all passengers and crew and those persons on

the ground or in buildings who might suffer injury or death from improper or unauthorized

operation of an aircraft.

64.   By virtue of their negligence, AMERICAN, MWAA and THE SECURITY

COMPANY DEFENDANTS breached their contracts to provide effective security at Dulles

Airport and to prevent security breaches which could cause injury or death to passengers and

persons on the ground or in buildings who might suffer injury or death from improper or

unauthorized operation of an aircraft.

65.   On and prior to September 11, 2001, AMERICAN, THE SECURITY

COMPANY DEFENDANTS and MWAA, by their respective officers, agents, employees,

servants and/or representatives, breached their duty to decedents and engaged in conduct which

was reckless, negligent, negligent per se, wrongful, unlawful, careless, and willful and wanton in

conscious disregard of the rights and safety of the passengers and others on the ground or in

buildings who might suffer injury or death as a result of improper or unauthorized operation of

an aircraft by violating applicable rules and regulations, including Federal Aviation Regulations;

and further by creating unreasonable dangers to Flight 77 passengers and the Pentagon Plaintiffs

in that AMERICAN, THE SECURITY COMPANY DEFENDANTS and MWAA:

- failed to implement, operate, maintain, supervise and control an adequate
airline and airport security system that ensured the safety of and protected
passengers and persons on the ground or in buildings who might suffer injury
or death upon improper or unauthorized operation of an aircraft against acts of
criminal violence, air piracy and terrorist activity;

19

- failed to adequately train, staff and equip Dulles Airport's airline and airport security system;

- failed to improve airline and airport security despite knowledge and prior warnings of numerous security breaches and lapses and terrorist threats to airline security;

- failed to properly screen the hijackers and allowed them aboard the subject aircraft with dangerous and deadly weapons capable of causing injury or death;

- violated proper security procedures, including FAA and internal airline/security guidelines and other security directives;

- failed to properly scrutinize the hijackers' tickets and identification documents;

- failed to properly monitor security checkpoints, x-ray machines and metal detectors;

- failed to install state of the art security equipment and systems to prevent hijacking and routinely failed to detect dangerous and deadly weapons capable of causing injury or death in undercover investigations;

- failed to adequately protect the subject aircraft's cockpit from unauthorized entry;

- failed to prevent the hijackers from entering the unprotected cockpit;

- failed to implement adequate safety and security measures to prevent hijacking;

- failed to equip the subject aircraft with a secure cockpit door and adequate locking mechanisms; and

- defendants were otherwise negligent, engaged in conduct that was negligent per se, reckless, wrongful, unlawful, careless, and/or willful in conscious disregard for rights and safety.

20

66.     As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

## COUNT TWO

### CLAIMS FOR WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST THE OTHER AIRLINE DEFENDANTS BASED ON NEGLIGENCE

67.     Plaintiffs incorporate by reference all prior allegations in this Complaint.

68.     On and prior to September 11, 2001, THE OTHER AIRLINE DEFENDANTS had an independent and non-delegable duty to maintain the security of their aircraft and Dulles Airport.  In recognition of that duty, THE OTHER AIRLINE DEFENDANTS subcontracted for security services to protect all flights departing from Dulles Airport.

69.     THE OTHER AIRLINE DEFENDANTS each had a duty or voluntarily undertook a duty through its contract with THE SECURITY COMPANY DEFENDANTS to exercise the highest degree of care for the safety and security of all passengers passing through security at Dulles Airport and for persons on the ground or in buildings who might suffer injury or death as a result of improper or unauthorized operation of an aircraft.

70.     THE OTHER AIRLINE DEFENDANTS each knew or should have known that the security screening systems and services at Dulles Airport provided by THE SECURITY COMPANY DEFENDANTS were grossly inadequate and posed a severe danger to its passengers and the public.  THE OTHER AIRLINE DEFENDANTS knew or should have known that the security systems at Dulles Airport had been demonstrated to be like a sieve, frequently

21

unable to detect dangerous and deadly weapons capable of causing injury or death in numerous evaluations.

71.    Each of THE OTHER AIRLINE DEFENDANTS knew or should have known that THE SECURITY COMPANY DEFENDANTS failed to adequately train its employees, hired illegal aliens, failed to conduct required criminal background checks, and routinely failed in undercover security evaluations to detect even the most obvious of dangerous and deadly weapons capable of causing injury or death.

72.    THE OTHER AIRLINE DEFENDANTS failure to remedy these known security lapses was a reckless, negligent and willful and wanton breach of their respective duties of care to all passengers passing through Dulles Airport and boarding aircraft there as well as to persons on the ground or in buildings who might suffer injury or death as a result of improper or unauthorized operation of an aircraft.

73.    As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.


## COUNT THREE

### CLAIMS FOR PERSONAL INJURIES, WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST AMERICAN, THE OTHER AIRLINE DEFENDANTS AND MWAA BASED ON NEGLIGENT SELECTION

74.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

75.    AMERICAN, THE OTHER AIRLINE DEFENDANTS AND MWAA had a non-delegable duty to the traveling  public and persons on the ground or in buildings who might suffer injury or death as a result of improper or unauthorized operation of an aircraft, including decedents, to provide competent and careful security of their terminal operations areas and aircraft.  In recognition of that duty, AMERICAN, THE OTHER AIRLINE DEFENDANTS and MWAA subcontracted for security services to protect all flights departing from Dulles Airport.

76.    AMERICAN, THE OTHER AIRLINE DEFENDANTS and MWAA failed to exercise reasonable care in the selection of a competent and careful security system contractor by employing THE SECURITY COMPANY DEFENDANTS.

77.    AMERICAN, THE OTHER AIRLINED DEFENDANTS and MWAA each knew or should have known that the security screening systems and services at Dulles Airport provided by THE SECURITY COMPANY DEFENDANTS were grossly inadequate and posed a severe danger to its aircraft, passengers and the public.  AMERICAN, THE OTHER AIRLINE DEFENDANTS and MWAA knew or should have known that security systems at Dulles Airport had been demonstrated to be like a sieve, frequently unable to detect dangerous and deadly weapons capable of causing injury or death in numerous evaluations.

78.    AMERICAN, THE OTHER AIRLINED DEFENDANTS and MWAA knew or should have known that THE SECURITY COMPANY DEFENDANTS failed to adequately train their employees, hired illegal aliens, failed to conduct required criminal background checks, and routinely failed in undercover security evaluations to detect even the most obvious of dangerous and deadly weapons capable of causing injury or death.

23

79.    THE SECURITY COMPANY DEFENDANTS' work as security system contractors at Dulles Airport presents a risk of physical harm and death unless skillfully and carefully performed commensurate with the threat of terrorist action.

80.    THE SECURITY COMPANY DEFENDANTS had a record of incompetent and careless operation and maintenance of their contracted security service obligations over many years according to FAA "Red Team" audits and other independent checks on the effectiveness of their security systems.

81.    AMERICAN, THE OTHER AIRLINE DEFENDANTS and MWAA's failure to remedy these known security lapses was a reckless, negligent and willful and wanton breach of their respective duties of care to all passengers passing through Dulles Airport and boarding aircraft there.

82.    AMERICAN, THE OTHER AIRLINE DEFENDANTS and MWAA's failure to exercise reasonable care in the selection, continued retention and supervision of competent and careful security system contractors were proximate contributing factors to the causes of each decedents' and plaintiffs' injuries and damages.

83.    As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

### COUNT FOUR

### CLAIMS FOR PERSONAL INJURIES, WRONGFUL DEATH AND SURVIVAL DAMAGES BASED ON RES IPSA LOQUITUR AGAINST ALL DEFENDANTS

84.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

85.     Defendants, and each of them, had exclusive management and control of the aircraft and airport security systems, through which the hijackers penetrated, and whose actions resulted in damages and death to each plaintiffs' decedents. The penetration of the security system and plaintiffs' decedents' deaths as set forth above are such that in the ordinary course of events would not have occurred if defendants had exercised ordinary care in the maintenance and operation of the security systems. Because of the defendants' exclusive control and management of the systems, defendants are possessed of superior, if not exclusive, access to information concerning the precise cause of the incident, and each plaintiff relies on the negligence of the defendants, as inferred from the general circumstances alleged herein. The penetration of the security system was not due to any action or contribution on the part of any plaintiffs' decedents.

86.     As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

## COUNT FIVE

### CLAIM FOR WRONGFUL DEATH DAMAGES AGAINST AMERICAN BASED ON ABSOLUTE LIABILITY UNDER THE WARSAW CONVENTION AND THE IATA AGREEMENT[2]

87.     Plaintiffs incorporate by reference all prior allegations in this Complaint.

88.     The hijacking and subsequent crash of the subject aircraft constituted an accident or unexpected unusual event external to decedents Kennedy, Edwards, Teague, Zheng and Whittington, under the applicable provisions of the Warsaw Convention.

---

[2]     Upon information and belief, plaintiffs Edwards, Kennedy, Teague, Zheng, and Whittington allege a cause of action under the Warsaw Convention.

25

89.     AMERICAN is liable to pay full, fair, and reasonable wrongful death and survival damages to plaintiffs for the deaths of Kennedy, Edwards, Teague, Zheng and Whittington under the Warsaw Convention, together with the International Air Transport Association Intercarrier Agreement on Passenger Liability and Provisions Implementing the Agreement which AMERICAN signed and embodied in their tariffs prior to and on September 11, 2001, because AMERICAN cannot meet their burden of proving that they took all necessary measures to avoid the hijacking and subsequent crash or that it was impossible for AMERICAN to take such measures.

90.     As a direct and proximate result of the conduct of AMERICAN, these defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

## COUNT SIX

### CLAIMS FOR WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST DEFENDANT BOEING BASED ON STRICT TORT LIABILITY

91.     Plaintiffs incorporate by reference all prior allegations in this Complaint.

92.     The aforementioned aircraft was being used in an intended and foreseeable manner on the morning of September 11, 2001.

93.     BOEING defectively designed the subject aircraft and their component parts and systems. Specifically, the design in use on September 11, 2001, in the subject aircraft was defective and unreasonably dangerous in that it did not include, among other things:

a.     a secure cockpit, including doors and locking mechanisms, that would prevent or deter unauthorized or unlawful entry into the cockpit, or a hijacking;

26

b.    hardened cockpit doors, more sophisticated locking systems for cockpit doors, secondary barriers to prevent cockpit intrusion, or doors with unique entry codes that would prevent or deter unauthorized or unlawful entry into the cockpit, or a hijacking;

c.    systems in the flight deck environment, such as cabin video surveillance systems, that would enable pilots to view and assess the situation in the cabin before unlocking and opening the cockpit doors;

d.    systems that would prevent or lock out unauthorized persons from taking over the flight controls, including, but not limited to, password protected flight controls;

e.    systems that would prevent unauthorized persons from disengaging the autopilot systems, taking physical control of the subject aircraft, and programming the aircraft to fly to a specific set of coordinates;

f.    flight controls that would send a notification to the Government and/or AMERICAN if unauthorized persons gained control of the aircraft's flight controls;

g.    features that would prevent unauthorized persons from shutting off the transponders of the subject aircraft; and/or

h.    aircraft systems designed to prevent or avoid intentional downing and/or crashing the subject aircraft into buildings or structures on the ground.

94.    Alternative and safer flight decks, systems, structures, airframes, locking mechanisms and cockpit doors were available for a nominal increase in cost, which would have prevented the

27

terrorists from gaining access to the cockpit of the subject aircraft, taking over the flight controls, and

crashing the subject aircraft into the subject buildings.

95.    The aircraft's defective design rendered the subject aircraft unreasonably dangerous,

and permitted the terrorists to gain access to the cockpit of and hijack the subject aircraft, and crash

the subject aircraft into the subject buildings.  BOEING's defective design of the subject aircraft was

a proximate cause of the deaths of plaintiffs' decedents.

96.    As a direct and proximate result of the conduct of defendant BOEING, BOEING

is jointly and severally liable for damages sustained by each plaintiff and each plaintiff is

entitled to recover such damages to the extent allowed under applicable law

**COUNT SEVEN**

**CLAIMS FOR WRONGFUL DEATH AND SURVIVAL DAMAGES
AGAINST DEFENDANT BOEING BASED ON NEGLIGENT DESIGN**

97.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

98.    BOEING owed plaintiffs a duty of care in safely designing the subject aircraft and

their component parts and systems, including, but not limited to, a duty to safety design:

a.    a secure cockpit, including doors and locking mechanisms, that would prevent or

deter unauthorized or unlawful entry into the cockpit, or a hijacking;

b.    hardened cockpit doors, more sophisticated locking systems for cockpit doors,

secondary barriers to prevent cockpit intrusion, and doors with unique entry codes

that would prevent or deter unauthorized or unlawful entry into the cockpit, or a

hijacking;

28

c.  systems in the flight deck environment, such as cabin video surveillance systems, that would enable pilots to view and assess the situation in the cabin before unlocking and opening the cockpit doors.

d.  systems that would prevent or lock out unauthorized persons from taking over the flight controls, including, but not limited to, password protected flight controls;

e.  systems that would prevent unauthorized persons from disengaging the autopilot systems, taking physical control of the subject aircraft, and programming the aircraft to fly to a specific set of coordinates;

f.  flight controls that would send a notification to the Government and/or AMERICAN if unauthorized persons gained control of the aircraft;

g.  features that would prevent unauthorized persons from shutting off the transponders of the subject aircraft; and/or

h.  install or use aircraft systems designed to prevent or avoid intentional downing and/or crashing the subject aircraft into buildings or structures on the ground.

99.  BOEING breached this duty of care by failing to, among other things:

a.  design and/or install a secure cockpit, including doors and locking mechanisms, that would prevent or deter unauthorized or unlawful entry into the cockpit, or a hijacking;

b.  harden cockpit doors, provide more sophisticated locking systems for cockpit doors, provide secondary barriers to prevent cockpit intrusion, or provide doors with unique

29

entry codes that would prevent or deter unauthorized or unlawful entry into the cockpit, or a hijacking;

c.   install or use systems in the flight deck environment, such as cabin video surveillance systems, that would enable pilots to view and assess the situation in the cabin before unlocking and opening the cockpit doors.

d.   install or use a system that would prevent or lock out unauthorized persons from taking over the flight controls, including, but not limited to, password protected flight controls;

e.   install or use systems that would prevent unauthorized persons from disengaging the autopilot systems, taking physical control of the subject aircraft, and programming the aircraft to fly to a specific set of coordinates;

f.   install flight controls that would send a notification to the Government and/or AMERICAN if unauthorized persons gained control of the aircraft;

g.   install features that would prevent unauthorized persons from shutting off the transponders of the subject aircraft; and/or

h.   install or use aircraft systems designed to prevent or avoid intentional downing and/or crashing the subject aircraft into buildings or structures on the ground.

100.   Defendant BOEING knew or should have known that the design of the subject aircraft and their component parts and systems was defective. Defendant BOEING failed to remedy this defect. The aircraft's defective design permitted the terrorists to gain access to the Flight 77 cockpit, take over the controls, and crash the subject aircraft into the subject buildings.

30

101.   In addition, BOEING knew or should have known that alternative and safer designs were available for a nominal increase in cost, which would have prevented the terrorists from entering the cockpit on the subject aircraft, taking over the controls, and crashing the subject aircraft into the subject buildings.

102.   The defective design of the subject aircraft was a proximate cause of the deaths of plaintiffs' decedents.

103.   As a direct and proximate result of the conduct of defendant BOEING, BOEING is jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable law.

## COUNT EIGHT

### CLAIMS FOR WRONGFUL DEATH AND SURVIVAL DAMAGES AGAINST DEFENDANT BOEING BASED ON BREACH OF WARRANTY

104.   Plaintiffs incorporate by reference all prior allegations in this Complaint.

105.   Prior to September 11, 2001, defendant BOEING expressly and/or impliedly warranted and represented that the subject aircraft, and their component parts and systems, including, but not limited to, the subject aircraft flight decks, systems, structures, airframes, locking mechanisms and cockpit doors, were airworthy, of merchantable quality, and/or fit and safe for the purposes for which they were designed, manufactured, assembled, inspected, tested, distributed, sold, serviced, maintained and/or repaired, intended, and used. Defendant BOEING further warranted that the subject aircraft, and their component parts and systems, including, but not limited to the subject aircraft flight decks, systems, structures, airframes, locking mechanisms

31

and cockpit doors, were free from all defects.

106.    Defendant BOEING breached said warranties in that the subject aircraft, and their component parts and systems, including, but not limited to, the subject aircraft flight decks, systems, structures, airframes, locking mechanisms and cockpit doors, were not airworthy, of merchantable quality, and/or fit and safe for the purposes for which they were designed, manufactured, assembled, inspected, tested, distributed, sold, serviced, maintained and/or repaired, intended, and used.  Defendant BOEING further breached said warranties in that the subject aircraft and their component parts and systems, including, but not limited to, the subject aircraft flight decks, systems, structures, airframes, locking mechanisms and cockpit doors, were not free from all defects.

107.    The breach of said warranties proximately caused the terrorist hijacking, crash, and the deaths of plaintiffs' decedents on September 11, 2001.

108.    As a direct and proximate result of the conduct of defendant BOEING, BOEING is jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable law.

### COUNT NINE

### CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

109.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

110.    Defendants owe a duty to the public and to the Plaintiff to adequately safeguard air travel.  Defendants undertook this duty freely.

32

111.    Defendants knew or should have known that their conduct and actions in failing to implement adequate security systems would lead to increased danger, risk of catastrophic injury, and severe, debilitating emotional distress to its passengers and to those on the ground, and to the Plaintiffs. The Defendants knew or should have known that the failure to implement adequate safety and security measures placed the public in extreme danger, increasing the risk of injury and the resulting emotional distress.

112.    The conduct and actions of the Defendants were done in breach of their duties and in negligent disregard for the rights and lives of the general public and of those killed and injured at the Pentagon.

113.    The course of conduct undertaken by the Defendants in failing to safeguard airports and aircraft was such that it was reasonably foreseeable to result in the death, injury and suffering of innocent people, both in the air and on the ground. The repeated failure to implement adequate security culminated in injury of and damage to plaintiffs' decedents resulting in severe, continuing, permanent mental, physical and emotional distress and suffering, and resulting loss of consortium and services to Plaintiffs.

114.    As a direct and proximate cause of Defendants' negligent, grossly negligent and/or reckless misconduct and disregard for public and aviation safety in breach of their duty, Plaintiffs have suffered severe emotional distress and ongoing psychiatric injuries and damages.

115.    Defendants, by reason of their negligent breach of duty and/or recklessness, inflicted emotional distress upon the Plaintiffs.

33

116.    As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each plaintiff and each plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

## COUNT TEN

### CLAIM FOR PUNITIVE DAMAGES
### AGAINST ALL DEFENDANTS

117.    Plaintiff incorporates by reference all prior allegations in this Complaint.

118.    The failure of the airline and airport security system at Dulles and the failure to secure the aircraft cockpit, which resulted in the hijacking of the subject aircraft and injuries and death to the decedent, were caused by the wanton, gross, reckless and wilful misconduct of defendants, including their officers, agents, servants and/or employees as set forth herein, whose actions and omissions were outrageous, willful, wanton and gross and said defendants acted with reckless disregard for public and aviation safety.

119.    As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by plaintiffs and plaintiffs are entitled to recover such damages to the extent allowed under applicable state law.

**WHEREFORE**, the plaintiffs demand judgment against AMERICAN, THE OTHER AIRLINE DEFENDANTS, THE SECURITY COMPANY DEFENDANTS, BOEING, and MWAA for all damages to the extent allowed under applicable law.

### JURY DEMAND

Plaintiffs demand a trial by jury.

34

Dated:     New York, New York
           July 18, 2007

                                    PLAINTIFFS' EXECUTIVE COMMITTEE

                     By:      _____/S/_____

                               Marc S. Moller, Esq.
                               Brian J. Alexander, Esq.
                               Kreindler & Kreindler
                               100 Park Avenue
                               New York, NY  10017-5590
                               (212) 687-8181
                               (212) 972-9432 (Fax)

MOTLEY RICE LLC
Ronald L. Motley, Esq.
Joseph F. Rice, Esq.
Mary F. Schiavo, Esq.
Jodi Westbrook Flowers, Esq.
Donald A. Migliori, Esq.
Michael E. Elsner, Esq.
Elizabeth Smith, Esq.
Justin B. Kaplan, Esq.
Vincent I. Parrett, Esq.
Motley Rice LLC
28 Bridgeside Boulevard
Post Office Box 1792
Mount Pleasant, SC  29465
(843) 216-9000
(843) 216-9450 (Fax)

Paul J. Hedlund, Esq.
John A. Greaves, Esq.
Robert E. Guilford, Esq.
Baum Hedlund
12100 Wilshire Boulevard, Suite 950
Los Angeles, CA  90025-7114
(310) 207-3233
(310) 820-7444 (Fax)

Michel F. Baumeister, Esq.
Douglas A. Latto, Esq.
Dorothea M. Capone, Esq.
Baumeister & Samuels, P.C.
One Exchange Plaza
New York, NY  10006-3008
(212) 363-1200
(212) 363-1346 (Fax)

Paul J. Hanly, Jr., Esq.
Jayne Conroy, Esq.
Hanly & Conroy, LLP
415 Madison Avenue
New York, NY 10017-1111
(212) 401-7600
(212) 401-7635 (Fax)

Frank H. Granito, Jr., Esq.
Frank H. Granito, III, Esq.
Kenneth P. Nolan, Esq.
Speiser, Krause, Nolan & Granito
Two Grand Central Tower
140 East 45th Street
New York, NY  10017
(212) 661-0011
(212) 953-6483 (Fax)

Michael J. Kuckelman, Esq.
Warden, Triplett, Grier, P.A.
Tower 42, Level 7
25 Old Broad Street
London  EC2N 1HN
England
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 872 5779
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 419 1360 (Fax)

Timothy W. Triplett, Esq.
Warden, Triplett, Grier, P.A.
Building 40 Corporate Woods
9401 Indian Creek Parkway, Suite 1100
Overland Park, KS  66210
(913) 491-3000
(913) 491-2979 (Fax)

JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Global Aerospace, Inc.

## DEFENDANTS
Metropolitan Washington Airports Authority

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Washington, D.C.
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
(d)
Donald J. Detweiler
1007 North Orange Street, Suite 1200
(cWilmington, Delaware 19801
Telephone: (302) 661-7000

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                              and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | **PERSONAL PROPERTY** | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 370 Other Fraud | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Security Act | ☐ 871 IRS—Third Party | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
28 U.S.C. 1332

Brief description of cause:
Declaratory judgment and breach of contract action rgarding liability under insurance policy.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE Hon. Alvin K. Hellerstein (SDNY)      DOCKET NUMBER 21 MC 97

DATE
10/9/07

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT #         AMOUNT         APPLYING IFP         JUDGE         MAG. JUDGE

American LegalNet, Inc.    www.USCourtForms.com

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____7 - 6 1 8_____

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

# *NOTICE OF AVAILABILITY OF A*
# *UNITED STATES MAGISTRATE JUDGE*
# *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____3_____ COPIES OF AO FORM 85.

_10 - 9 - 07_

(Date forms issued)

_William Hopkins_

(Signature of Party or their Representative)

_William Hopkins_

(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action